EPHRAIM N. PECK AND WIFE vs. THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

The plaintiffs, husband and wife, sixty years old, drove in a top phaeton along a street that crossed a railroad track in the city of M, driving a dull horse. It was the early evening, when it was growing dark, and was the regular time for a train to leave the station, which was a short distance above this crossing, and to pass over the track at this place. They had lived for thirty years in M and were familiar with the locality. As they approached the crossing they heard the train arriving at the station, and the wife asked the husband, who was driving, to look out for the cars, and the engine with its headlight could easily have been seen if they had leaned forward and looked. Before they got upon the track

the bell rang for the gates to be closed, and the gateman on the other side immediately began to swing his gate. The husband tried to stop the horse but was not able to do so, and the other gate, which was swung immediately after, caught in a wheel of the carriage as he was trying to drive through. The wife being alarmed jumped out and was hurt. The engineer did not start his engine until the carriage had got safely across, and if the wife had remained in the carriage she would not have been hurt. Held that the railroad company was not liable for the injury received by the wife. (Two judges dissenting.)

The plaintiffs were guilty of want of ordinary care in attempting to drive across when they knew, or could have seen by looking, that a train was about to pass.

If the husband alone was guilty of actual negligence, his negligence would be imputed to the wife.

It made no difference that it was a highway, which was open to all the public. It was also the defendants' track, over which they had an equal right to pass with their trains.

It was the duty of the gatemen to close the gates immediately upon the signal being given. It was the duty of the plaintiffs to stop their horse before they got upon the track, and the gatemen had a right to presume that they would do so.

Nor was the engineer guilty of negligence. He gave the signal before the plaintiffs were on the track and did not start his train until they were out of the way.

TRESPASS ON THE CASE, for an injury to the wife through the negligence of the defendants; brought to the Court of Common Pleas. The defendants demurred to the declaration, and the demurrer was overruled and the case heard in damages. The following facts were found by the court:—

On the 13th day of April, 1878, the plaintiffs, being husband and wife, rode to a store on Colony street in the city of Meriden. Colony street is next west of Railroad Avenue. The carriage occupied by the plaintiffs was an ordinary low-top phaeton, the top being up at the time of the accident. They were a little over sixty years of age. Mrs. Peck left the carriage, went into a store, and as she came out the plaintiffs heard a train of cars moving over the defendants' road. It was then about half-past seven o'clock in the evening, and it was about the regular time for a train to leave the Meriden station to go to New Haven.

The plaintiffs had lived in Meriden about thirty years and a little more than one mile from the railroad station. Mrs. Peck got into the phaeton and they started to go home,

passed a few rods down Colony street, and turned easterly into Main street. The plaintiffs had been in the habit for many years of driving over the tracks of the defendants in Main street. On this occasion Mr. Peck was driving. The horse was gentle, about eighteen years old, was generally used in team work, was somewhat heavy and stupid and not sensitive to the bit. It had belonged to Mr. Peck for some time. They drove easterly along Main street upon a slow trot, and were driving a few feet south of the centre line of the roadway. At this time the regular down express train was standing at the station, headed toward the crossing, and the headlight of the locomotive was lighted. The locomotive was about one hundred feet north of the centre of Main street, where it crosses the main track of the defendants' road. When within about two rods of the west side of the west main track, Mrs. Peck said to her husband, "Be sure there are no cars." He replied, "The gate is all right, we can go through; the gate-tender is leaning on his gate." She looked and saw the gate-tender at the south gate leaning on his gate and that the gates were then open for the public to pass. At any point in Main street for a distance of fifty feet west of the main track, it was possible for the plaintiffs to have seen the headlight of the locomotive, if they had bent forward and looked to the left of the top of the carriage; but there was no evidence to show that they did look or attempt to look in that direction.

The two gates at this crossing were at this time operated by employees of the defendants, who were constantly on duty to open and close them for the better protection of travelers having occasion to cross the railroad at this point. The gates had been used for several years prior to that time and the plaintiffs had knowledge of the defendants' opening and closing them. They were so constructed that when opened to public travel they were closed to the passage of the trains, being swung across their tracks on either side of the crossing. The south pole was about forty-seven feet long; the north pole about forty-eight and a half feet long. The gates were heavy, and in their construction heavy iron

braces, running diagonally from the outer portions of the gates to the upright poles, were necessary. This construction rendered it impossible for the gates to be opened and closed simultaneously, and by a standing order of the company the south and east gate, to avoid confusion and accidents, was always closed first, and the north and west gate was not and could not be started from its position across the track until the south and east gate was practically across Main street, east of the track. The south and east gate was attached to an upright standard or pole located at the southeast corner of the crossing and was stretched toward the west when the crossing was opened to public travel. The north and west gate was attached to an upright standard at the northwest corner of the crossing. When the crossing was opened to the public, the ends of the gates were.fastened respectively at the northeast and southwest corners.

When the plaintiffs had approached the west side of the main track, being then south of the centre of Main street, and while the head of the horse was something more than ten feet west of the west rail of the main track, the alarm bell for the closing of the gates had been struck by the engineer upon the locomotive, and the keeper of the southeast gate, in obedience to the alarm bell, swung that gate to close it upon the east side, and the end of the gate passed close in front of the horse of the plaintiffs. Mr. Peck pulled back the horse to stop him, but did not succeed and the horse continued across in the same general direction until his head was near the closed gate on the east side. At this point of time, the gate-keeper of the northwest gate had begun to move his gate to close it. The bell was ringing on the engine, though the train did not start. It was growing dark. There was some shouting and calling. Both plaintiffs heard some one call once or twice, " Get out of there," or " Get out of there, damn you," and they thought it came from the employees of the company ; but it is not so found ; there were several men standing near who were not employes of the company and they were looking at the confusion. At the same time the horse was substantially at a standstill,

and the end of the northwest gate interlocked slightly against the left hind wheel of the plaintiffs' carriage, striking against the felloe so that the carriage could not be moved far in either direction. Thereupon Mrs. Peck looked up, saw the headlight of the engine, became alarmed and jumped out of the carriage. She struck with one foot upon one of the rails of the side track, broke her ankle and seriously injured the bones of her foot. Some men immediately came to her assistance and carried her into a store east of the track.

The phaeton was then lifted around from the rear so as to release the pole from the carriage wheel; the east gate was pushed further to the east, so that the horse and phaeton could pass out on the northeast side. The north and west gate was pushed on to its position across Main street, and the train then started from the station and passed down over the west main track. The horse and phaeton were safely across the tracks before the engine left the station. The carriage and horse and harness were not injured except that the varnish on one wheel was scratched by the gate. If Mrs. Peck had remained in the phaeton she would not have been injured. If there had been no gates the plaintiffs would have passed the crossing in safety.

The Main street at this point was over fifty feet wide and there was nothing but the gates as described and the tracks to prevent the horse and carriage from being turned around. There were no other vehicles and no temporary obstructions in the way. The gate-keeper of the southeast gate pushed his gate before him and did not know the plaintiffs were following him and his gate across the track. The gate-keeper of the northwest gate could see the plaintiffs and their carriage as he was pushing his gate. The bell of the engine was ringing its alarm until the accident took place. Mr. Peck supposed that he could get across safely by following the south and east gate, because he thought the gate-keeper would move his gate further east, as he subsequently did, and let him out on the northeast side.

No negligence is found in either of the plaintiffs or in the

defendants, except such as may be inferred from the facts herein found. Mrs. Peck was seriously injured and confined to her bed for many months. If, upon the foregoing facts, the law is such that the plaintiffs are entitled to recover more than nominal damages, then the damages are found to be one thousand dollars; but if only nominal damages ought to be recovered, then the damages are assessed at fifty dollars.

The question, whether the plaintiffs were entitled to anything more than nominal damages, was reserved for the advice of this court.

*T. E. Doolittle* and *W. H. Law*, for the plaintiffs.

1. The finding leaves the question of negligence for the inference of this court. The court can find such negligence on the facts. And such a question has been repeatedly reserved for this court. *Knight* v. *Goodyear India Rubber Glove Co.*, 38 Conn., 440. See also *Dimock* v. *Town of Suffield*, 30 id., 129; *Strouse* v. *Whittlesey*, 41 id., 560; *Parker* v. *Union Woolen Co.*, 42 id., 399. And the burden of proof is on the defendants. *Crane* v. *Eastern Transportation Line*, 48 Conn., 361.

2. The right of the traveler to pass over and along this street is equal to that of the defendants to cross it. Shearm. & Red. on Neg., § 481, and authorities there cited; *Ernst* v. *Hudson River R. R. Co.*, 35 N. York, 9; *Beisiegel* v. *N. York Central R. R. Co.*, 34 id., 622. Mrs. Peck, in the exercise of her legal privilege, did not expose others to injury, and was charged with no duty of extraordinary care. The defendants exercised their privilege with agencies perilous to human life, and they were under a correlative obligation to use them with the highest degree of care. As the highway was never dangerous, except when they made it so, by driving their engines across it, and as they never crossed it without some degree of jeopardy to the wayfarer, the law has provided for the protection of the citizen, by requiring the defendants to give special warning whenever their engines approach an ordinary road crossing,

by the blowing of a whistle and the ringing of a bell.
Gen. Statutes, 320, § 13. And where the burden of travel
is greater, then a special tribunal created by the legisla-
ture may order the defendant, in addition to the ordinary
signals, to keep a man with a flag at the crossing, to warn
the approaching traveler, and protect the public. And
when the crossing is in a crowded street of a city, the
same tribunal may order the defendants to erect and
maintain, before the approach of a train, an impassable bar-
rier against the traveler, so that by no possibility can a
traveler get upon the crossing when a train is approaching.
Gen. Stats., *supra*. This last was the duty which the statute
and the statutory tribunal imposed upon the defendants.
The defendants have violated this plain duty in the grossest
manner. They have so closed their gates as not to *exclude*
but to *include* the traveler at the point of intersection be-
tween the railway and the highway. They did not shut out
the plaintiffs as they had the means to do, but they shut them
in, when their duty was to shut them out. The office of the
western gate is to bar out western travel, and the case finds
that that gate was wide open and had not been moved when
the plaintiffs drove across the track on the highway. When
the defendants had failed to close the western gate in time
to exclude them from the track, and had in fact imprisoned
them on the track, what was then their duty? Clearly to
open the doors of this prison in any direction to get them
out of it. It was the duty of the eastern gate-keeper to
open his gate and let them pass out; for his gate is to let
people out passing to the east and shut out those passing to
the west. And it was the duty of these two gate-keepers
to shut their gates in such manner as to exclude travelers
in ample time before the approach of a moving train. And
when the eastern gate-keeper found the plaintiffs enclosed
in the track, it was his duty to do that which he did after
Mrs. Peck was hurt, namely, open the gate and let the team
out, and long before the train passed. There was no reason
why the east gate should not have been opened for this
purpose. The case finds that there were no obstructions,

and not a vehicle in the way. There was no office for that east gate to perform except to let the plaintiffs pass off the track. There was no traveler seeking to enter, and none to bar off from the track. Again, there was plenty of time for the defendants to remove the public from this place of intersection, for this case differs from any in the books, for the train was not even approaching, but was at rest, standing absolutely still. But the case finds that the man at the west gate flung around his gate, and fastened the plaintiffs on the track, by running the end of the gate into the hind wheel of the phaeton; and there was a cry, "Get out of that, — you," and Mrs. Peck looked up and saw the headlight, and knowing that the carriage was fastened, in her terror jumped out; and after she was taken up and carried to a store, and she and the horse and the phaeton had passed out of the east gate, then this train, which had been standing still and could not hurt anybody, started. The case finds that "if there had been no gates the plaintiffs would have passed the crossing in safety." Her injury can only be attributed to the grossest mismanagement of this contrivance, designed to protect the public, and which would, if properly operated, have been an absolute protection.

3. It was gross negligence to erect gates to be operated in this manner, so that a traveler could be shut in upon the track. It was their duty to construct gates that had a perpendicular and not a horizontal motion, such as they have now substituted, or if they had horizontal gates, to have had shorter gates and more men, so that they could be closed simultaneously.

4. When the keeper of the west gate saw that the plaintiffs had entered upon the track, it was his duty to tell the plaintiffs to turn around and pass back on the west side, so that he could close his gate. As the railroad company had so constructed their gates that only one gate could be closed at the same time, then it was their manifest duty to tell those persons who were on the track to turn around in front of the gate about to be closed, and have the track

free to close the gate. Especially was this so when the engine and train was stationary and would not start till all obstructions were removed from the track. At least it was their duty to warn the traveler, and give him an opportunity to get off the track, and not to pin him to the track, and shout, "Get out, —— you!"

5. Again, if the defendants used this wretched contrivance of two gates, one shutting after the other, it was the duty of the gate-keeper to close the gate with some regard to the rights and safety of the public traveller. The case finds that the gates were open inviting the public to pass, and suddenly this east gate-keeper, standing behind and leaning his head on the gate, without a word of warning or even looking up to see if he is about to swing the gate against a traveler, pushed his gate right around in front of this horse and never knew it was behind him. If this gate-keeper had waited a second (and there was no hurry, as the engine was still,) he would have pushed the gate around to its position behind the plaintiffs. They would have passed in safety, as they would have done if there had been no gates. This servant of the defendant should at least have looked up and warned an approaching traveler that he was about to shut the gates. The slightest warning would have stopped the plaintiffs if given in due season.

6. Mrs. Peck was guilty of no negligence. The case finds that she and her husband, both about sixty years old, were jogging along behind an old horse, and when within about two rods of the track, she said to him, "Be sure there are no cars!" He replied, "The gate is all right; we can go through; the gate-tender is leaning on his gate." The case finds that then she did just what she ought to have done, and looked precisely where she ought to have looked, namely, at the man stationed there by the defendants, whose duty it was to keep the public off the highway when its use was desired by the railroad company; "she looked and saw the gate-tender at the east gate, leaning on his gate, and that the gates were open for the public to pass." It was not her duty to look anywhere, because she had a

right to rely on the fact that the statute had been complied with, and that the gates would be closed if there was any danger of an approaching train. She knew there could not be a train within eighty rods of the crossing, and if a train was standing still, no engineer would start his train and run her down. He could not, if he had the disposition, because she could pass before the train by any possibility could reach the crossing. *Beisiegel* v. *New York Central R. R. Co.,* 34 N. York, 622; *Ernst* v. *Hudson River R. R. Co.,* 35 id., 9, 26, 35; Shearm. & Red. on Neg., § 481. It is said by the defendants' counsel that it was the duty of the plaintiffs, at a distance of forty-nine feet from the track, to have looked out from the phaeton and up the track. It was not their duty; it was their duty, if they were under any obligation, to look at the gate-keeper, whom the company had placed there not only to warn them, but to fence them off the track. But suppose they had looked up the track at this distance from it, they would have seen a stationary train, which would have admonished them to hurry up, lest the train should start. The plaintiffs were not negligent in driving up to the track when they were invited by the open gate to cross; and without the slightest warning, the gate was suddenly swung around in front of the horse. This heavy horse could not stop his momentum and he went upon the track; and Mr. Peck had a right to suppose that the defendants' servants, after they had let him on the track, would not shut him in, but that he could pass out through the east gate, as the easiest way to get off the track, and as there was nothing in the way to prevent it; but the other gate-keeper, seeing (as the case finds) the horse and carriage, deliberately swings his pole into the hind wheel of the carriage, and having locked it so that it could not move, yells to them to get out, and Mrs. Peck looks up, and seeing the head-light of the locomotive, is frightened and jumps from the carriage to escape being crushed by the locomotive, and is injured. It is not for the defendants, having negligently placed her in this position of imminent peril, to say that she erred in judg-

ment and jumped out when she ought not to have done so. *Buel* v. *N. York Central R. R. Co.*, 31 N. York, 314; *Coulter* v. *Am. Merchants Un. Express Co.*, 56 id., 585; *Twomley* v *Central Park &c. R. R. Co.*, 69 id., 158; *Schultz* v. *Chicago & Nor. Western R. R. Co.*, 44 Wis., 638; Wharton on Neg., §§ 304, 377.

*G. A. Fay*, for the defendants.

1. The only question reserved for the advice of this court is, whether the plaintiffs are entitled upon the finding to anything more than nominal damages. As the record expressly sets forth that "no negligence is found in either of the plaintiffs or in the defendants, except such as may be inferred from the facts found," judgment should be entered for nominal damages only, as a matter of law, for this court can not infer negligence. *Shaw* v. *Boston & Wor. R. R. Co.*, 8 Gray, 80. "The existence of negligence or want of care present from their very nature a question not of law but of fact, depending upon the peculiar circumstances of each case; and such principal facts must be found before the court can take cognizance of it, and pronounce upon its legal effect." *Park* v. *O'Brien*, 23 Conn., 345, 347; *Beers* v. *Housatonic R. R. Co.*, 19 id., 570; *Williams* v. *Town of Clinton*, 28 id., 266; *Aldridge* v. *Great Western Railway*, 2 Eng. Railway and Canal Cases, 852. This court "will not upon evidence reported assume the responsibility of finding by inference therefrom a fact which the court below could not find." *Brady* v. *Barnes*, 42 Conn., 518.

2. To enable the plaintiffs to recover "anything more than nominal damages, they were bound to prove a series of facts; and hence the record must find: 1st, Negligence on the part of the defendants; 2d, That the injury to the plaintiffs occurred in consequence of that negligence; and 3d, That such injury was not caused in whole or in part by their own negligence. *Birge* v. *Gardner*, 19 Conn., 511; *Park* v. *O'Brien*, 23 id., 345; *Neal* v. *Gillett*, id., 444; *Fox* v. *Glastonbury*, 29 id., 209; *Blaker's Exr.* v. *N. Jersey*

*Midland R. R. Co.*, 30 N. Jer. Eq., 241; *Chicago & N. W. R. R. Co.* v. *Dimick*, 96 Ill., 42; *Marble* v. *Ross*, 124 Mass., 44; *Brown* v. *European & N. Am. R. R. Co.*, 58 Maine, 387.

3. The plaintiffs must show "directly or inferentially" that they "are free from contributory negligence." *Fox* v. *Glastonbury*, 29 Conn., 209; *Parker* v. *Union Woolen Co.*, 42 id., 402; *Hart* v. *Hudson River Bridge Co.*, 84 N. York, 62; *Riceman* v. *Havemeyer*, id., 647. The finding that before crossing the defendants' road "it was possible for the plaintiffs to have seen the head-light of the stationary locomotive, but that there was no evidence to show that they did look or attempted to look in that direction," is decisive against the plaintiffs. The plaintiffs' neglect to use their eyes was palpable negligence as a matter of law. *Butterfield* v. *Western R. R. Co.*, 10 Allen, 532; *Wilds* v. *Hudson River R. R. Co.*, 24 N. York, 430; *S. C.*, 29 id., 327; *Bellefontaine R. R. Co.* v. *Hunter*, 33 Ind., 335; *Palys* v. *Erie R. R. Co.*, 30 N. Jer. Eq., 604; *Penn. &c. R. R. Co.* v. *Rathgeby*, 32 Ohio St., 66; *McGrath* v. *N. York Central R. R. Co.*, 59 N. York, 471; *Artz* v. *Chicago, &c. R. R. Co.*, 34 Iowa, 158; *Chicago & Alton R. R. Co.* v. *Becker*, 84 Ill., 485; *Penn. R. R. Co.* v. *Righter*, 42 N. Jer. Law, 185; *Railroad Co.* v. *Houston*, 95 U. S. Reps., 697. The finding that "the gatekeeper was leaning on his gate" could not be construed into evidence of safety as a matter of law, and as a fact should have been heeded as a warning that the gatekeeper was about to close the gate. *McGrath* v. *N. York Central R. R. Co.*, 59 N. York, 471; *Phil. & Reading R. R. Co.* v. *Boyer*, 97 Penn. St., 102; *Penn. R. R. Co.* v. *Righter*, 42 N. Jer. Law, 186.

4. If the defendants are not entitled to a discharge as a "matter of law," yet the record fails to find sufficient facts to entitle the plaintiffs to recover more than nominal damages; because the burden of proof of showing negligence on the part of the defendants and due care on that of the plaintiffs as a fact is wholly upon the plaintiffs, and the finding is insufficient in failing to establish those facts as facts. *Fox* v. *Glastonbury*, 29 Conn., 209; *Wilds* v. *Hudson*

*River R. R. Co.*, 24 N. York, 434; *Adams* v. *Inhab. of Carlisle*, 21 Pick., 147; *Button* v. *Hudson River R. R.*, 18 N. York, 248; *Gahagan* v. *Boston & Lowell R. R. Co.*, 1 Allen, 190. If this court were to attempt an inquiry into the facts by aid of the record, it could arrive at no satisfactory result, as the finding is not sufficiently explicit. It is found that "the end of the northeast gate interlocked slightly against the left hind wheel," but the record is silent as to whose the fault was. If that of the plaintiffs, it would bar a recovery. If the defendants', then the inquiry arises, did the plaintiffs contribute? If through the fault of neither, "it must be borne by the suffering party as a providential visitation." If through the fault of both, the plaintiffs must bear it, as "the law cannot measure the degree of carelessness." *Shaw* v. *Boston & Wor. R. R. Co.*, 8 Gray, 79; *Neal* v. *Gillett*, 23 Conn., 443; *Strouse* v. *Whittlesey*, 41 id., 559.

5. Had the injuries to the plaintiffs been the result of direct violence on the part of the defendants, it is possible this court might consider the question of negligence, but being consequential it cannot, because the finding that Mrs. Peck "became alarmed and jumped out of the carriage," and that "had she remained in the phaeton she would not have been injured," involves the inquiry as to whether, as a fact, her own "rashness and imprudence" did not contribute to such injury. The defendants "are not to be responsible for rashness and imprudence of a passenger; it must appear that there existed a reasonable cause for alarm." *Jones* v. *Boyce*, 1 Stark., 493; *Lund* v. *Inhab. of Tyngsboro'*, 11 Cush., 565.

6. The question as to whether the negligence of the husband is imputable to the wife we think does not arise in this case in view of the finding. Should the court think otherwise, then the law is so that the negligence of the husband is to be imputed to the wife. *City of Joliet* v. *Seward*, 86 Ill., 402; *Prideaux* v. *City of Mineral Point*, 43 Wis., 513; *Otis* v. *Janesville*, 47 id., 422; *Lake Shore, &c. R. R. Co.* v. *Miller*, 25 Mich., 274.

CULVER, J.*—The question reserved for the advice of this court is, whether upon the facts found the plaintiffs are entitled to anything more than nominal damages. If the plaintiffs were guilty of such negligence as essentially contributed to the injury, they certainly are not.

[The judge here states the facts.]

We think the facts show very clearly that the plaintiffs were guilty of such negligence as essentially contributed to the injury. They knew, or might have known, that a train was near, for they heard it only a moment before they arrived at the crossing. By bending forward and looking to the left of the carriage they could have seen the train standing at the station, for the head-light of the locomotive was lighted. When within about two rods of the crossing Mr. Peck was particularly cautioned by Mrs. Peck to be sure there were no cars. Ordinary prudence should have prompted both Mr. Peck and his wife to look and see whether a train was near.

We think the facts show culpable negligence on the part of both husband and wife. But if the husband alone was guilty of negligence, it is well settled that under such circumstances his negligence is to be imputed to his wife. *Carlisle et ux.* v. *Sheldon*, 38 Verm., 440; Shearman & Redfield on Negligence, § 46; and many more authorities which might be cited.

In *Butterfield* v. *Western R. R. Co.*, 10 Allen, 532, it was held that a traveler upon a highway which is crossed by a railroad on a level, who knows that he is near the crossing and yet does not look up to see if a train is coming, is guilty of such negligence that he cannot recover for an injury sustained from a collision. In that case it was stormy, and the traveling bad, but the court say that that did not excuse the man from using his sense of sight. CHAPMAN, J., speaking for the court, says: "By due

* Judge *Culver,* of the Superior Court, was called in to sit in this case, in the place of Judge *Pardee,* who was disqualified by interest. It was agreed by counsel that Judge *Loomis,* who was not present, should receive the briefs on both sides and join in the decision of the case.

care, is meant reasonable care adapted to the circumstances of the case. The crossing of a place known to be so dangerous as a railroad track frequently is by reason of the passing trains, reasonably requires a high degree of watchfulness and attention. Before attempting to cross a man should make reasonable use of his sense of sight, as well as of hearing, in order to ascertain whether he will expose himself to collision."

In *Wilds* v. *Hudson River R. R. Co.*, 24 N. York, 430, the court say: "One driving in a highway across the railroad track is guilty of negligence fatal to an action if he does so without looking for a train which he would have seen, or listening for signals of its approach which he would have heard, in time to have avoided a collision. It is also such negligence in one knowing the position of the road and the frequent passage of trains, to approach a crossing at such speed as to be unable to stop his horse before getting upon the track. * * The danger may be there; the precaution is simple; to stop, to pause, is certainly safe. His time to do so is before he puts himself in ' the very road of casualty.' If he fails to do so it is of no consequence in the eye of the law whether he merely misjudges or is obstinately reckless. His act is not careful, and he ought to abide the consequences—not the company under or into whose train he saw fit to run—whether he did so in inexcusable ignorance or in the belief that he could run the gauntlet unharmed. Nor is the court to look about to find how he, after putting himself there, conducted; whether he then took the best means of escape, or in his confusion ran more hopelessly into the jaws of death. No degree of presence of mind, no want of presence of mind at that time, has anything to do with the case. *He should not be there by want of care.*"

It is said that the place where the accident occurred is a highway, and that the plaintiffs had a right to be there. Such a claim was answered by GOULD, J., in the same case, as follows:—"Certainly it is a highway, or he would have no right to be there at all, and he could not recover,

no matter what might be the negligence of the company. Further, it is a part of a railroad track, and the train has a right to pass there. It is a place in which two easements have a common right; and it is the right of the public that both should be so enjoyed as not unnecessarily to interfere with or abridge the rights of either. A sound and reasonable view of cases of this description is of as much importance to the public as it is to railroad companies. Such corporations are to be treated precisely as any other party. No more stringent rule is to be applied to them than is applied to individuals; nor is any less stringent one. Every citizen of the state has a deep interest in the existence and the successful operation of such companies; they have need of those powerful means, the use of which is necessarily accompanied with danger. But as the public has the benefit of those means it is bound to incur its share of the danger. A mutual duty is enjoined, and a mutual liability results from a failure to perform that duty; and the party who fails in performing his own part thereof is in no condition to enforce the penalty of a breach on the other." The court further say:—" A railroad crossing is known to be a dangerous place, and the man who knowing it to be a railroad crossing approaches it, is careless unless he approaches it as if it were dangerous."

It is insisted by the plaintiffs' counsel that the gate-tenders were guilty of culpable negligence in closing the gates as they did; that they should have waited until the plaintiffs had crossed, notwithstanding their instructions to close them when the engineer gave the signal for closing them.

It is found that the gate-tender of the south gate did not know that the plaintiffs were following him and his gate. If he saw them at the time the bell was struck by the engineer he knew they were a considerable distance from the outer rail of the main track, and would naturally suppose they would heed the warning and stop. He was engaged in moving his ponderous gate, forty-seven feet long, with his back to the plaintiffs. Mr. Peck knew it was his duty to

stop his horse and endeavored to do so, and doubtless would have succeeded but for its being so hard mouthed and dull.

It does not appear from the facts that the man at the north gate supposed, or had reason to suppose, that his gate would come in contact with the plaintiffs' carriage when he began to move it in obedience to the signal. That gate was forty-eight and a half feet long. For aught that appears, the slight interlocking and striking the felloes may have been, and probably was, occasioned by the horse being pulled round by Mr. Peck in his vain efforts to stop it.

I see no culpable negligence on the part of the gate-tenders. They were constantly on duty to open and close the gates for the better protection of travelers having occasion to cross. When the engineer struck his bell as a signal to close the gates, as he was about to start his train, it was their duty to obey instructions. If they may refuse to close the gates when the signal is given for that purpose, and wait for a team to pass over which happens to be within ten or twelve feet of the outer rail of the main track at the time the signal is given, a train might be delayed an indefinite time. In a city like Meriden a number of teams might be approaching from either side, and if one might pass why not the others, as each came up within the same distance? It is more reasonable that a team or a number of teams should wait a few moments than that a train of cars, with its mails and hundreds of passengers, should be detained.

Neither was the engineer guilty of culpable negligence. He was ready to start his train. If he saw the plaintiffs he too knew that they were a considerable distance from the outer rail, and had good reason to suppose that they would stop at the sound of the bell. He did not start his train however, but held it until Mr. Peck and his team were safely across.

If Mrs. Peck had remained in the carriage she would have passed safely across, as did her husband. She *misjudged*. She was in no real danger, and there was no more reason for her jumping out of the carriage than there was for her husband. She could see the locomotive, and might have

known as well as her husband that the engineer would not start his train so long as the team was in danger of being struck by it.

The Court of Common Pleas is advised to render judgment in favor of the plaintiffs for the smaller sum, fifty dollars.

In this opinion PARK, C. J., and LOOMIS, J., concurred; CARPENTER and GRANGER, Js., dissented.