## MORGAN vs. THE CENTRAL RAILROAD.

1. The statute requiring railroad companies to erect blow-posts at a distance of four hundred yards from road crossings, and that the engineer shall blow the whistle of the engine and keep blowing until the engine passes the crossing, and simultaneously check and keep checking the speed of the train, so as to stop in time should any person or thing be crossing the track on the highway, is penal in its character, and subjects employés failing to observe its provisions to indictment and punishment; and being penal, it should be strictly construed. It applies in terms to trains approaching or passing beyond points where blow-posts should be located, and not to those working exclusively between such points.

(a.) The provision requiring the continuous checking of the speed of the train is a harsh one, and legislation modifying it is suggested.

2. Had the station agent in this case known the timidity of the mare which was injured through becoming frightened by a passing train, and that in that respect she was different from other draught animals bringing freight to the depot, or had the driver of the team been in the employment of the company and subject to the agent's orders, then negligence might have been inferred from the invitation of the agent to the driver to come to the depot and unload. Such was not the fact, however, and the driver, though knowing the liability of the mare to take fright, made no protest or objection to driving to the platform.

3. It is only where the company's servants make unusual and unnecessary noises in the running of their trains, and where no necessity for the making of such noises is made to appear, that it is liable for injuries resulting in consequence thereof.

(a.) The continued blowing of a whistle, instead of preventing, would probably have contributed to the injury in this case.

4. The presumption arising against a railroad, where damage is done to stock or other property by the running of its locomotives or cars, was rebutted in this case by the evidence for the plaintiff. A nonsuit might have been awarded; but this not having been done, and evidence for the defendant having been introduced, a finding for the plaintiff was unsupported by the evidence, and was properly set aside.

(*a.*) The grant of a new trial in this case was proper, although one new trial had already been granted.

November 23, 1886.

Railroads. Damages. Negligence. New Trial. Before Judge ADAMS. Effingham Superior Court. November Term, 1885.

Reported in the decision.

J. G. & D. H. CLARK, by TOMPKINS & BRANDON, for plaintiff in error.

LAWTON & CUNNINGHAM, for defendant.

HALL, Justice.

Had this been the first grant of a new trial, it is conceded that there could have been no reason for interfering with the judgment ordering it because of any abuse of discretion on the part of the judge who presided in the case; but inasmuch as it is the second verdict in favor of the plaintiff, it is contended that the court had no right to set it aside, upon the ground that it was decidedly and strongly against the weight of evidence, if there was any testimony, however slight, to authorize it. Had this assumption been true, the conclusion insisted on would have followed, and this would be so if there was a decided preponderance of evidence in its favor, even though the judge refused a proper charge, requested in writing by the defendant, which would not, if given, necessarily have changed the finding. A careful examination of the record, however, satisfies us that the plaintiff's case for a recovery was de-

cidedly weak; indeed, so weak as almost, if not quite, to approach the point at which a nonsuit would have been proper, if not inevitable.    The case made was substantially this:    The plaintiff's team, a mule and a mare, hitched to a wagon and driven by a negro, was sent to station No. 4 of the Central Railroad to carry a barrel of syrup for shipment.    The warehouse of the station runs north and south. On the west side, and next to the warehouse, is a side-track or turnout, and next to this and west of it is the main track.  On the east side thereof is another side-track known as the local-track.    The team came from the east on the public road, which runs north of the warehouse and crosses the railroad tracks at this point.    When the team reached the station, the construction train was on the local track; the driver saw that the mare was afraid of it, and the road being blocked by it, he waited until it passed off towards the south.    The station agent, who did not know the mare was afraid of the train and had perceived no evidences of her fright, then told the driver to come to the warehouse and unload.    He made no objection and gave no reason why it would be unsafe to do so, but at once proceeded to back the wagon on the public road to the platform on the north side of the warehouse.    The train, which had been working in this locality all the morning, unloading telegraph poles, went down the local track to a switch some 150 or 200 yards away, blew brakes on and off and returned on the track to the west side of the warehouse to take on wood and water; its speed did not exceed four miles an hour; there was no blowing of whistles or letting off steam, nor does any unusual noise appear to have been made. The driver heard the train approaching, went to the mare's head, held her by the bit and patted her; she threw herself back and fell, and in falling broke her back.    She was proved to be worth from $100 to $125.    The verdict was for seventy-five dollars.    Neither in going down nor in returning did the train reach the blow-posts on either side of the public road, and consequently did not give the signal re-

quired by the statute (code, §708 *et seq.*) when reaching and passing these posts. The speed of the train was slackened, however, and it was well in hand all the time and could have been readily stopped at any moment before reaching the public road, if any one had been passing along it either with or without a team. It was insisted, on the trial, that the persons in charge of the train were negligent in not giving the warning and observing the other requirements of the statute when approaching a public crossing. To obviate this suggestion and in reply thereto, the defendant's counsel requested the court, in writing, to charge the jury, "Unless they found from the evidence that the train which frightened the animal came at the time from a point not less than four hundred yards from the crossing, then the law did not require the blowing and continuance of the blowing of the whistle, as set out in §§708, 709 and 710 of the code, and the fact that no blow-posts were there could have nothing to do with the case." This charge the court refused to give. Then, thinking that he erred in refusing it, he granted a new trial.

1. The statute from which these sections of the code are taken is penal in its character, and subjects employés failing to observe its provisions to indictment, and on conviction, to punishment; and being penal, it should be strictly construed. It applies in terms to trains approaching or passing beyond points where blow-posts should be located, and not to those working exclusively between such points. If run carefully and at a low rate of speed, as this train, according to the undisputed evidence, seems to have been run, surely under such circumstances no conviction had on an indictment against the engineer ought to be allowed to stand; and it would seem that the company ought not to be subjected to an imputation of negligence from thus using the machinery necessary to operate its road. The law which requires the engineer to blow the whistle upon approaching one of these posts, and to keep blowing until it passes the crossing, and to simultaneously check and keep check-

ing the speed of the train, so as to stop in time should any person or thing be crossing the track or the highway, is, to say the least, an extremely hard requirement, especially as to this last provision, upon railroad companies, interfering materially with the speed necessary to carry out their schedules and to enable them to meet their connections. In this respect, we are satisfied that there should be some legislation modifying and altering this regulation. There can be no reasonable objection to blowing the whistle from the posts on either side thereof to the crossing, but it would seem that this ought to be sufficient to give warning to ordinarily prudent persons and to protect the public, without thus checking the speed at which the train is running, thereby occasioning delay and rendering it almost impossible to make the time which the public service and exigencies demand in this age of rapid transit.

2. Had the station agent known the timidity of this mare and, in that respect, how different she was from other animals bringing freight to the depot, or had the driver of the team in the employment of the company and subject to his orders, then negligence might have been inferred from the invitation given to come to the depot and unload; but he had no control of the driver and knew nothing of the disposition of the animal. The driver was not bound to obey his direction, and knowing how liable the mare was to take freight, ought not to · have done so, at least without some protest or objection; and having gone forward without so much as an intimation that there might be danger on account of the indisposition of the animal, the negligence was wholly his own, and it would seem that had he exercised ordinary care, he could have easily avoided the consequences to his team. The agent and other employés of the company were guilty of no negligence which could charge it with responsibility for the loss of this animal.

3. It is only where the company's servants make unusual

and unnecessary noises in the running of their trains, and where no necessity for the making of such noises is made to appear, that it is liable for injuries done in consequence of such needless and unusual noises.  This is the clear doctrine laid down by this court in the *Georgia Railroad and Banking Company vs. Thomas*, 73 *Ga.* 350, as well as in *Georgia Railroad vs. Carr, Id.* 557, and in other cases cited on the brief of counsel for defendant in error.  Had the engineer kept blowing his whistle from the time he shifted his train to another track at the switch until he reached the station, this, so far from affording protection to plaintiff's team, might have occasioned more serious and extensive injury, and would have been an act, according to these cases, that afforded evidence of negligence, if not wantonness and recklessness.

4. Save the statutory presumption against the company (code, §3033), where damage is done to stock or other property by the running of its locomotives or cars, which was overcome by the defendant's evidence, there was no fact in proof which tended to show negligence on its part or on the part of its employés, unless we are to presume that the station agent knew, when he said to the driver of the team that he might come up to the station-house and unload, that the mare was more easily frightened than other draught horses coming there with loads; and such an inference is so far-fetched and improbable, that we are not prepared to hold that a verdict resting on it alone could be sustained.   In this view of the matter, the safest and best course to pursue would have been, as it seems to us, to have awarded a nonsuit on the motion made by the defendant; but as this was not done, then the uncontradicted denial of the agent that he knew the mare in question or her liability to take fright at the ordinary noises made by the careful running of trains, certainly removed any foundation on which to rest a finding for the plaintiff, and left the verdict wholly unsupported by evidence.

The new trial was properly awarded on each one of the

grounds taken in the motion, except it may be on that which alleged error in refusing to nonsuit.

Judgment affirmed.