Atlanta & Charlotte Air-Line Rwy. Co. *v.* Gravitt.

1. There was no error in admitting the evidence of a witness introduced upon a former trial of the same case, when it appeared that the witness, since testifying, had removed to the State of Texas. Whether or not a witness beyond the jurisdiction of this State is "inaccessible" in the sense in which that word is used in section 3782 of the code, is, under all the circumstances of the particular case, a question for determination by the trial court in the exercise of a sound discretion.

2. Where a boy eleven years old, whose labor was worth six dollars per month, and who resided with his parents, worked with his father on a farm and rendered services to his mother about the house in the performance of her household duties, the benefit of his labor and services being thus realized by the parents in the support of themselves and their family, they being laboring people and mutually dependent upon the labor of one another for a support, the mother was dependent upon the boy, and he contributed substantially to her support.

3. Where a father entrusts his minor son, a youth of tender years, to the care and custody of another, such person becomes the legal representative and agent of the father in discharging the duty which the law imposes upon the latter, of guarding and shielding the child from injury. Accordingly, if the child, by reason of the gross negligence of his custodian in taking him upon a high and dangerous trestle, is run over by a passenger-train and killed, such negligent conduct is, in law, imputable to the father himself.

v 93-24

| | |
|---|---|
| 93 | 369 |
| 93 | 513 |
| 93 | 788 |
| 93 | 369 |
| 94 | 580 |
| 93 | 369 |
| 95 | 362 |
| 95 | 690 |
| 93 | 369 |
| 103 | 640 |
| 105 | 139 |
| 105 | 481 |
| 93 | 369 |
| 106 | 872 |
| 93 | 369 |
| 107 | 75 |
| 93 | 369 |
| 110 | 329 |
| f111 | 18 |
| h111 | 574 |
| 111 | 885 |
| 93 | 369 |
| f112 | 86 |
| 93 | 369 |
| f113 | 217 |
| f113 | 377 |
| 93 | 369 |
| 117 | 769 |
| 93 | 369 |
| e119 | 335 |
| 93 | 369 |
| 121 | 464 |
| 93 | 369 |
| 123 | 215 |
| 93 | 369 |
| e124 | 1035 |
| 93 | 369 |
| d127 | 12 |
| 127 | 13 |
| 93 | 369 |
| f129 | 843 |

Such custodian could not, however, properly be regarded as likewise the representative or agent of the child's mother. By express statute, in this State, the father is vested with the control of his minor child, and the mother is not accountable for the conduct of a custodian for him chosen by the father. Nor, in a suit by the mother in her own right, as authorized by special statute, is she chargeable with the negligence of the father, merely because of the conjugal relation existing between them.

4. Relatively to a person who, without license from the company, is walking upon a railway track on a trestle, though such trestle be situated between a blow-post and a public crossing, the omission of the engineer to comply with the statutory requirements as to giving signals and checking the speed of the train, is not negligence, inasmuch as these requirements raise no duty as between the company and strangers who may be upon the track elsewhere than at a public crossing.

5. The duty to observe all ordinary and reasonable care and diligence towards such person arises when his presence becomes known to the engineer, and not before. A failure in such care and diligence after that time, from which injury results, unless it could have been avoided by the use of ordinary care on the part of the person hurt or killed, will render the company liable.

6. Although omission of the statutory requirements, when a part of the *res gestæ*, may be considered by the jury in passing upon the question of negligence relatively to the person injured or killed, yet, where the evidence as a whole shows there was no negligence imputable to the company or its servants except failure to observe these requirements, the company is not liable for results occurring upon the track of its road elsewhere than at a public crossing.

7. The mere opinion of a locomotive engineer that a heavy passenger-train consisting of a locomotive and six cars, running down grade at forty-five miles an hour, could be stopped within a distance of one hundred yards, is not sufficient to overcome the positive and uncontradicted evidence of the engineer and fireman upon the identical train, that all was done which could possibly be done to stop it, and that nevertheless it was not stopped within a distance of over four hundred yards, especially when the evidence of these witnesses was strongly corroborated by others who were experts in such matters.

February 26, 1894. Argued at the last term.

Action for damages. Before Judge WELLBORN. Hall superior court. July term, 1892.

HENRY JACKSON, GEORGE D. THOMAS and SAMUEL C. DUNLAP, for plaintiff in error. J. B. ESTES, H. H. PERRY, H. H. DEAN and M. L. SMITH, *contra.*

LUMPKIN, Justice.

The facts of this case, so far as material, will be stated in connection with the legal principles discussed.

1. One ground of the motion for a new trial alleged that the court erred in allowing the plaintiff to introduce, over objection of the defendant, the evidence of one Willingham, contained in a brief of the evidence taken at a former trial of this same case; it appearing that the witness, who had formerly resided in the county where the trial occurred, had removed to Texas and that his place of abode in that State was well known to the officers of court, and also in the community in which he had resided before leaving Georgia. "That a witness is beyond the jurisdiction of the State is generally a sufficient cause for not producing him." See *Eagle & Phenix Manufacturing Company* v. *Welch*, 61 *Ga.* 448, citing 1 Greenlf. Ev. §163 and note on page 235, and also previous decisions of this court. And see the later case of *Gunn* v. *Wades*, 65 *Ga.* 537. After an examination of the authorities, and after some reflection, our conclusion is, that whether or not a witness beyond the jurisdiction of this State is "inaccessible," in the sense in which that word is used in section 3782 of the code, is in each particular case a question for determination by the trial judge in the exercise of a sound discretion. We are unadvised as to whether or not there is any statute in Texas for compelling the attendance before commissioners of a witness whose testimony by interrogatories is desired in the courts of another State. In the absence of a law of this kind, there could be little doubt as to the inaccessibility of the witness Willingham; and even if we knew of the existence of such a law in Texas, we are not prepared to say we would hold that the trial judge erred in deciding that the witness was inaccessible.

2. The boy killed by the defendant railway company

was eleven years of age. The second head-note states substantially the nature and character of the services he rendered at his parents' home. There was evidence that his labor was worth six dollars per month in money. In order to authorize a recovery by the mother for the homicide of this child, it was essential for her to make it appear that he contributed to her support. *Clay* v. *Central Railroad,* 84 *Ga.* 345. If he did contribute to her support, and she was substantially dependent upon the child in part for support, the fact that she was also dependent upon her husband and her own labor, would not defeat her right to recover. *Daniels* v. *Savannah, Florida & Western Ry. Co.,* 86 *Ga.* 236. In the present case, we think the mother was dependent upon the boy, and that he contributed substantially to her support. This conclusion is sustained by the decision of this court, made after full and careful deliberation upon the question now under consideration, in *Augusta Railway Co.* v. *Glover,* 92 *Ga.* 132, 18 S. E. Rep. 406. See head-note 6, and the comments thereon by Chief Justice BLECKLEY. The only practical difference between that case and the one at bar is, that there the son was between fifteen and sixteen years of age, while in the present case the boy killed was between eleven and twelve. The principle applicable is the same in both cases.

3. The doctrine of imputable negligence is, to some extent, involved in the present case. Judicial opinion has not, in the past, been harmonious as to the extent or the application of this doctrine. The various questions which have arisen when it has been invoked have led to many perplexing doubts, and much conflict and confusion in the earlier decisions. We have, therefore, thought it not unprofitable to enter into a somewhat extended consideration of the doctrine, so far as it has any bearing on the facts now before us; for though this discussion may not be absolutely essential to a correct

and intelligible disposition of the present case, we are willing to undergo the considerable amount of labor required, in the hope that it may prove useful to this court, as well as to the judges of the trial courts, in determining questions which are likely to arise in the future in similar cases.   The plaintiff seeks to recover for the homicide of a minor son, eleven years of age.   As any negligence of the child himself, or any negligence legally imputable to him, which would have defeated a recovery by him had he been injured instead of being killed, and had brought an action for the injuries, would now defeat a recovery by the mother, it is important at the outset to determine how the child's rights in such an action would be affected by his own negligence, or that of another.   Under the facts of this case, it is hardly necessary to go into the question of the child's own negligence; but the inquiry does arise, whether or not the undoubted negligence of the person in whose charge he was when killed, could or could not have been properly urged as a defence to an action brought in his behalf. As considerable conflict is presented by the numerous cases in which this inquiry has heretofore arisen, we shall attempt to review the leading decisions on the subject, with a view to ascertaining what the true law is.

The rule imputing to a child of tender years the negligence of its parent, guardian or custodian, was introduced into the law of this country by Hartfield v. Roper, 21 Wend. 615.   The reasoning employed in support of this rule is thus stated by Cowen, J., who delivered the opinion of the court in that case : " An infant is not *sui juris*.   He belongs to another, to whom discretion in the care of his person is exclusively confided.   That person is keeper and agent for this purpose; and in respect to third persons, his act must be deemed that of the infant; his neglect, the infant's neglect."   The principle thus announced has since been recognized, and

is still adhered to, by the courts of the State of New York: Mangum *v.* Railroad Co., 38 N. Y. 455; Ihl *v.* Railroad Co., 47 N. Y. 317, 7 Am. Rep. 450; Cosgove *v.* Ogden, 49 N. Y. 255, 10 Am. Rep. 361; Morrison *v.* Railway Co., 56 N. Y. 302; Thurber *v.* Railroad Co., 60 N. Y. 333; McGarry *v.* Loomis, 63 N. Y. 104, 20 Am. Rep. 510; Huerzeler *v.* Railroad Co., 20 N. Y. Suppl. 676.

The doctrine laid down in Hartfield *v.* Roper has received the approval of a number of other courts of equally high standing, and has been accepted and applied in Massachusetts, California, Minnesota, Indiana, Maryland, Maine, Kansas and Delaware : Gibbons *v.* Williams, 135 Mass. 333; McGeary *v.* Railroad Co., *Id.* 363, 15 Am. & Eng. R. R. Cas. 407; O'Connor *v.* Railroad Co., 135 Mass. 352, 15 Am. & Eng. R. R. Cas. 362; Holly *v.* Boston Gas Light Co., 8 Gray, 123; Wright *v.* Railroad Co., 4 Allen, 283; Callahan *v.* Bean, 9 Allen, 401; Lynch *v.* Smith, 104 Mass. 52, 6 Am. Rep. 188; Karr *v.* Parks, 40 Cal. 188; Schierhold *v.* Railroad Co., *Id.* 447; Meeks *v.* Railroad Co., 52 Cal. 602, s. c. 56 Cal. 513, 38 Am. Rep. 67; City of St. Paul *v.* Kuby, 8 Minn. 166; Fitzgerald *v.* Railway Co., 29 Minn. 336, 13 N. W. Rep. 168, 8 Am. & Eng. R. R. Cas. 310, 43 Am. Rep. 212; Pittsburg &c. Ry. Co. *v.* Vining's adm'r, 27 Ind. 513; Lafayette &c. R. R. Co. *v.* Huffman, 28 Ind. 287; Hathaway *v.* Railway Co., 46 Ind. 25; McMahon *v.* Railway Co., 39 Md. 438; Baltimore &c. Railway Co. *v.* McDonnell, 43 Md. 534; Leslie *v.* Lewiston, 62 Me. 468; O'Brien *v.* McGlinchy, 68 Me. 552; Smith *v.* Railroad Co., 25 Kan. 738, s. c. 28 Kan. 541, 8 Am. & Eng. R. R. Cas. 327; Kyne *v.* R. R. Co. (Del.), 14 Atl. Rep. 922.

Yet, the harshness of this rule seems to have been generally recognized; and even in those jurisdictions where it is still tenaciously adhered to as sound in principle, the modern tendency has been to modify it, and

to limit its application, as far as possible, consistently with the adjudged cases.   Accordingly, it has been held that the doctrine of imputable negligence has no application in a case where, notwithstanding negligence on the part of parents in .permitting·their child to be exposed to peril,.. the child itself exercised due care. O'Brien *v.* McGlinchy, 68 Me. 552.; Lynch *v.* Smith, 104 Mass. 52, 6 Am. Rep. 188     Indeed, this modification of the rule announced in Hartfield·*v.* Roper first found utterance in the very State where the rule itself was given birth : Lannen *v.* Albany Gas Light Co., 46 Barb. 264.   Hogeboom, J., in delivering the opinion of the court in. that case, says, on page 270 ∶ "But I know of no just or legal principle which, when the infant himself is free from negligence, imputes to him the negligence of.the parent, when, if he were an adult, he would escape it.   This would be, I think, ' visiting the sins of the fathers upon the. children '. to an ∶ extent not contemplated in the *decalogue*, or in the: more imperfect digests of ·human law." . The later decisions in New York State have strictly. conformed to this view : Ihl *v.* Railroad Co., .47 N. Y. 317, 7 Am. Rep. 450 ; McGarry *v.* Loomis, 63 N. Y. 104, 20 Am. Rep. 510 ; Huerzeler *v.* Railroad Co., 20 .N. Y. Suppl. 676.   The rule has received a further very material modification by the courts refusing, in many cases, to hold, as matter of law, that parents were negligent in not keeping constant and unremitting watch and. restraint .over their children, this question of negligence. being left to the jury for determination.   Examine cases cited *supra*.   While in Maryland it is held that, though a parent may be negligent in exposing a child to peril, still, if the defendant could have avoided injury to it by the exercise of ordinary care, the child may nevertheless recover damages. McMahon *v.* Railway Co., 39 Md. 438 ; Baltimore &c. Ry. Co. *v.* McDonnell, 43 Md. 534.

Although, as has been seen, the rule announced in Hartfield *v.* Roper has received a very considerable following, its correctness has been doubted and severely criticised in many other jurisdictions. As early as 1850 the reasoning of that case was expressly repudiated by Redfield, J., in Robinson *v.* Cone, 22 Vt. 213. While in the later case of Whirley *v.* Whiteman, 1 Head (Tenn.), 609, McKinney, J., in speaking of New York's pioneer case, says: " This decision is no less opposed to the current of authority upon the point, than to every principle of reason and justice. It is, literally, to visit the transgression of the parent upon the child." No less severe is the criticism of Chief Justice Brickell, of Alabama, who says: "It seems repulsive to our sense of justice that, because the parent is negligent of his child, others may with impunity be equally negligent of its helplessness, and equally indifferent to its necessities." Government St. R. R. Co. *v.* Hanlon, 53 Ala. 82. Chief Justice Beasley, in Newman *v.* Railroad Co., 52 N. J. L. 450, disposes of the question thus tersely: " The conversion of the infant, who is entirely free from fault, into a wrong-doer by imputation, is a logical contrivance uncongenial with the spirit of jurisprudence." While in Bellefontaine &c. R. R. Co. *v.* Snyder, 18 Ohio St. 399, Welch, J., aptly remarks that to impute the negligence of the parent to the child would be to recognize and apply "the old doctrine of the father eating grapes, and the child's teeth being set on edge." Nor has the ruling in Hartfield *v.* Roper escaped the severe and unreserved disapprobation of the leading text-writers. See elaborate discussion and criticism in Whart. Negl. (2d ed.) §§313, 314; Bish. Non-Contract Law, §581 *et seq.*; Beach Contr. Negl. (1st ed.) §38 *et seq.*, (2d ed.) §116 *et seq.* Mr. Beach, after citing cases to show that when a donkey is carelessly run down in the highway, where he is negligently exposed by the owner, the defendant

is held liable; or, where oysters are negligently placed in a river-bed, it is an injury redressible at law for a vessel negligently to disturb them, sarcastically adds: "It appears, therefore, that the child, were he an ass or an oyster, would secure a protection which is denied him as a human being of tender years, in such jurisdictions as enforce the English or the New York rule in this respect."

It may be here incidentally remarked that, since the overruling of the celebrated English case of Thorogood v. Bryan, 8 C. B. 115, imputing to a passenger the negligence of the driver of a public conveyance, the position of the English courts upon the question now before us would seem to be left in doubt. ("The Bernina," 12 Prob. Div. 58; affirmed in Mills v. Armstrong, 13. App. Cas. 1.) There may be later adjudications touching this question by the English courts, but we have not deemed it essential to ascertain definitely as to this by an absolutely exhaustive search, nor have we thought it profitable in this discussion to cite any of their previous decisions. As a matter of general information, however, it may be stated that what is commonly known as the "English rule" was first expounded in Waite v. Northeastern Railway Co., El., Bl. & El. 719. In that case it appeared that the plaintiff, an infant about five years of age, was in charge of its grandmother, who procured tickets for both at a railway station, with the intention of taking the train at that place. In crossing a track to reach a platform, they were run down by a train, under circumstances of concurrent negligence on the part of the grandmother and of the servants of the company. It was held that the action could not be maintained, because of the legal "identity" of the infant plaintiff with his guardian or custodian, whose negligence would be imputable to the child.

For a further discussion of the subject now under con-

sideration, and full citation of authorities, reference is made to: Whit. Smith Negl. §§412–415; 1 Shear. & Redf. Negl. §74 *et seq.*; Deering Law of Negl. §28; Patterson, Ry. Law, 76–78; 2 Wood's Ry. Law, 1284; Pollock, Torts, 297–300; Cooley, Torts, 818 *et seq.*; Bigelow, Torts, 319; Addison, Torts, 576 (note); 3 Lawson, Rights, Rem. & Pr. §1210; 4 Am. & Eng. Enc. of Law, 82–89. An examination of the above authorities, and of the cases therein referred to, warrants the assertion that the *consensus* of opinion now is that those decisions are wholly unsound, and without any foundation in reason to support them, which hold that the rights of the infant are identified with, or dependent upon, those of its parent; and that, upon the principle of agency, the act of the parent must, in law, be deemed that of the child. Judge Thompson remarks, in the vernacular of the present day, that the doctrine which these decisions seek to uphold " seems fast going by the board." 2 Thomp. Trials, §1687. The decided weight of current authority is in accord with the view thus succinctly stated by Arnold, J., in the recent case of Westbrook *v.* Railroad Co., 66 Miss. 560, 14 Am. St. Rep. 587: "Infants have legal rights distinct from their parents, among which is the right to security from personal injuries occasioned by the negligence, or willful wrong, of others. Negligence or dereliction of the parent or custodian of children is no justification for others to injure them." Accordingly, it is held in Mississippi that where the suit is brought by, or in behalf of, the infant in its own right, contributory negligence on the part of its parents, or others standing *in loco parentis*, will not operate as a bar to recovery, or present any defence to the suit. Such is the rule which also obtains in— .

Ohio—Bellefontaine &c. R. R. Co. *v.* Snyder, 18 Ohio St. 399; Cleveland &c. R. R. Co. *v.* Manson, 30 Ohio St. 451; Street Ry. Co. *v.* Eadie, 43 Ohio St. 91, 23 Am. & Eng. R. R. Cas. 269.

Pennsylvania—North Pa. R. R. Co. v. Mahoney, 57 Pa. St. 187; Erie Pass. Ry. Co. v. Schuster, 113 Pa. St. 415, 57 Am. Rep. 471.

Virginia—Norfolk &c. R. R. Co. v. Ormsby, 27 Gratt. 455; N. & W. R. R. Co. v. Groseclose's adm'r, 88 Va. 267, 13 S. E. Rep. 454.

Alabama—Government St. R. R. Co. v. Hanlon, 53 Ala. 70; Pratt Coal & Iron Co. v. Brawley, 83 Ala. 371.

New Jersey—Newman v. R. R. Co., 52 N. J. L. 446.

Michigan—Battishill v. Humphrey, 64 Mich. 494, 28 Am. & Eng. R. R. Cas. 597; Shippy v. Village of Au Sable, 85 Mich. 280.

Nebraska—Huff v. Ames, 16 Neb. 139.

Tennessee—Whirley v. Whitman, 1 Head, 609.

Vermont—Robinson v. Cone, 22 Vt. 213.

Connecticut—Daley v. Railroad Co., 26 Conn. 591, 68 Am. Dec. 413.

Iowa—Wymore v. Mahaska Co., 78 Iowa, 396.

Texas—Williams v. Railroad Co., 60 Tex. 205; G., H. & H. Ry. Co. v. Moore, 59 Tex. 64.

Missouri—Winters v. Railway Co., 99 Mo. 509, distinguishing Stillson v. Railroad Co., 67 Mo. 671, and following Boland v. Railroad Co., 36 Mo. 484.

Illinois—Chicago City Ry. Co. v. Wilcox, 33 Ill. App. 450; affirmed by the Supreme Court, 138 Ill. 370, 27 N. E. Rep. 899.

Georgia—*Ferguson, next friend,* v. *Columbus & Rome Railway,* 77 *Ga.* 102. While in the case last cited, this court did not enter into a discussion of the question, it distinctly ruled that: " The fault of the father, if any, is not attributed to the infant, the action being brought by the infant herself."

In many of the text-books it is stated that the opposite view prevails in Illinois, and numerous decisions of the Supreme Court of that State are cited in support of this statement, seemingly with good reason. Be this as

it may, however, that State, by its recent decisions, has "wheeled into line," and joined the procession of those jurisdictions which have repudiated the doctrine of Hartfield *v.* Roper. The Appellate Court of Illinois took the initiatory step in this direction in the case of Chicago City Ry. Co. *v.* Wilcox, cited *supra*, Gary J., remarking: "That a child suing for wrong done him shall be cut off from remedy because others neglected their duty to him, is a doctrine going into '*innocuous desuetude.*'" On appeal of this case to the higher court, the judgment therein was affirmed. In delivering the opinion of the Supreme Court, Mr. Justice Bailey reviews exhaustively the former decisions of that court, and seeks to distinguish the case then in hand from those which apparently recognize the New York or English rule. In conclusion, he says: "This court, however, cannot fairly be said to be committed to a doctrine, upon the principle of *stare decisis*, by its recognition or assertion in a case which does not call for its application, and the decision of which rests wholly upon other grounds. Not being concluded, therefore, by any of our former decisions, we are disposed to adopt the rule which seems to us to be most reasonable and most in conformity with the recognized principles of the common law, viz., that where a child of tender years is injured by the negligence of another, the negligence of his parents, or others standing *in loco parentis*, cannot be imputed to him so as to support the defence of contributory negligence to his suit for damages."

We will now pass, as next in order, to a consideration of what are the rights of a parent, in an action brought in his own behalf for the injury or homicide of an infant child, occurring under circumstances of concurrent negligence on the part of both such parent and of the defendant to the suit.

Quite a different rule prevails where the suit is brought,

not by the child himself or by another in his behalf, but by the child's parent, or by one standing *in loco parentis* and having a legal interest in his life.   In such case, negligence on the part of the child's parent or custodian may utterly defeat a recovery.   The reason for this is apparent, and has been uniformly recognized and sanctioned.   It rests upon the broad ground of common justice, that one whose negligence has brought about a calamity to a little one whom he is legally bound to watch over and protect from injury, cannot be allowed to profit by the results of his own inexcusable, if not criminal, neglect and misconduct.   There is no conflict among the decisions upon this question.   Even in those jurisdictions which have repudiated the doctrine of imputable negligence as announced in Hartfield *v.* Roper, there has been no departure from this just and equitable principle, and this rule has been universally recognized and strictly enforced:  Westbrook *v.* Railroad Co., 66 Miss. 560; Shippy *v.* Village of Au Sable, 85 Mich. 280; Glassey *v.* Railway Co., 57 Pa. St. 172; Erie Pass. Ry. Co. *v.* Schuster, 113 Pa. St. 412; Bellefontaine Ry. Co. *v.* Snyder, 24 Ohio St. 670; Street Ry. Co. *v.* Eadie, 43 Ohio St. 91; Williams *v.* Railroad Co., 60 Tex. 205; Chicago City Ry. Co. *v.* Wilcox, 33 Ill. App. 450, affirmed by the Supreme Court, 138 Ill. 370, s. c. 27 N. E. Rep. 899; Pratt Coal & Iron Co. *v.* Brawley, 83 Ala. 371; Huff *v.* Ames, 16 Neb. 139; Norfolk & Western R. R. Co. *v.* Groseclose's adm'r, 88 Va. 267, 13 S. E. Rep. 454; Wymore *v.* Mahaska Co., 78 Iowa, 396.   And see the following text-books:  Beach Contr. Negl. (1st ed.) §§44, 45, (2d ed.) §131 *et seq.;* 2 Thomp. Negl. 1191; Whart. Negl. §310; 3 Lawson, Rights, Rem. & Pr. 2135; Bish. Non-Contract Law, §§578 to 580.   It is equally well settled, as will appear from an examination of the authorities just cited, that though the father was not himself present, but the injury to the child occurred

while it was under the care and in charge of another person to whom its safety had been entrusted, the rule would still apply in all its strictness. It being the imperative legal duty of a father to guard and shield his child from injury, if he delegates that duty to another, he is legally responsible for the conduct of that other, whose every act is, in legal contemplation, the act of the father himself. This principle is clearly stated in Bellefontaine Ry. Co. *v.* Snyder, cited above, which was a suit by the father for an injury negligently inflicted by the defendant upon his child, while the latter was in the custody of an elder sister. It was in that case announced that: "What a party does by his agent he does himself, and the case stands no otherwise than it would have stood had the father himself been present, taking charge of the child. In order to render the principal accountable for the acts or omissions of his agent, it is by no means necessary to show the incompetency of the agent, or that the principal was at fault in his selection and appointment. However competent the agent, and however careful and prudent the principal may be in his selection and appointment, the agent acts at the peril of the principal, who stands accountable in law for all the agent's acts and omissions."

Whether the rule barring a recovery should be extended to cover a case where an administrator sues for the wrongful homicide of a child, caused by the concurrent negligence of the child's parents and of a third person, but to which suit neither of the parents is a party plaintiff, is a question not so easy of determination. In Illinois it has been said that the reason for the rule applies equally well to such a case, because the inevitable result of a recovery by the administrator would be to enrich the child's parents, who would inherit his estate, and thus profit by their own gross neglect of duty. Toledo &c. Ry. Co. *v.* Grable, adm'r, 88 Ill. 441; Chi-

cago &c. Ry. Co. *v.* Schumilowsky, 8 Ill. App. 613; Chicago City Ry. Co. *v.* Wilcox, 33 Ill. App. 450, s. c. 138 Ill. 370. But a contrary view was expressed in Wymore *v.* Mahaska County, 78 Iowa, 396, where this point was directly raised and passed upon. Robinson, J., directs attention to the fact that the administrator "seeks to recover in the right of the child, and not for the parents"; and adds: "It may be that a recovery in this case will result in conferring an undeserved benefit upon the father, but that is a matter which we cannot investigate. If the facts are such that the child could have recovered had his injuries not been fatal, his administrator may recover the full amount of damages which the estate of the child sustained." The same position was taken by the Supreme Court of Appeals of Virginia in Norfolk & Western R. R. Co. *v.* Groseclose's adm'r, 88 Va. 267, 13 S. E. Rep. 454. Even where the suit is by the child himself, it might probably result, in the event of his subsequent death, that his parents would derive the full benefit of his recovery. So it would seem that the sounder view is that entertained by the courts of Iowa and Virginia, especially when it is considered that the object of the rule is not to shield a negligent defendant from the penalty of his wrong-doing, but merely to deny aid to a plaintiff who, though equally guilty, nevertheless comes into a court of justice and demands the fruits of his own unpardonable neglect of both a moral and a legal duty.

In the present case it appeared that the deceased was in charge of his uncle at the time he was killed. The uncle intended making a journey on foot to a neighboring village, and by permission of the father, the boy was allowed to accompany him. The mother of the boy, who is the plaintiff in this suit, was dutifully informed by her son of the permission which his father had granted him, but, it seems, raised no objection to his going.

There was a good and safe dirt road leading to the village, but the uncle chose to walk on the railroad track, which lay parallel thereto. Coming to a high trestle some 380 feet long, he attempted to cross in company with the boy, and while yet upon the trestle, both were run over and killed by a rapidly approaching passenger-train. That this conduct on the part of the uncle amounted to almost criminal negligence, there can be no doubt. Indeed, it can hardly be considered otherwise than just that he should have paid the penalty he incurred for thus ruthlessly exposing so young a boy to such obvious and imminent peril. In the light of these facts and in view of the foregoing discussion of the law applicable thereto, it is clear that while the youth, had he lived, would not have been affected by this negligence on the part of his uncle, the father would thereby be utterly precluded from recovering damages for the homicide of his son. So far as the father is concerned, it is the same as though he himself had deliberately led his son into this death-trap. But the question presented by the record is whether the plaintiff, the mother of the boy, is also barred of recovery. It can be contended that she is only upon the idea, either that the uncle was the agent of herself as well as of her husband, or that the negligence chargeable to her husband was imputable to her, and, in legal contemplation, should be considered her own. We shall first consider whether the uncle can properly be considered as representing her, as well as the father, in undertaking to provide for the safety of her son. By express statute, in this State, " until majority, the child remains under the control of the father." Code, §1793. And if the marriage relation remains undisturbed until the death of the father, it is not until then that the mother has any legal right to exercise such control. Code, §1794. As matter of fact, in the present instance, it was the father who entrusted the

child to his uncle's care. This the father had an undoubted right to do, being, of course, held strictly accountable for the manner in which the uncle performed
the delegated duty of watching over and shielding the
child from danger. To this selection by the father of
a custodian for his child, the mother gave, at best,
merely a silent acquiescence by offering no objection.
Whatever moral right she may have had to voice the
claims of motherhood and protest against the selection
of an untrustworthy person to watch over her offspring,
certainly there was no legal duty devolving upon her to
oppose her husband's will or take any part in the matter whatsoever. The father alone was accountable to
the law for the manner in which he exercised the control vested in him by statute, and the person to whom
he delegated the duty of caring for his child could not
properly be considered the agent of any one save the
father himself, the mother having had no voice in such
agent's selection and appointment. If the child was
left by the father in charge of its mother, of course it
would be the duty of the latter to take proper means to
protect it; and if she entrusted this duty to another,
such person would then be her agent. But this could
only occur when the duty of guarding the child devolved
upon her,—certainly not at a time when the father was
present and exercising his control by taking the child
out of the mother's care, and placing it in charge of another acting for the time being as his agent. Under
the facts of this case, there is nothing to warrant the
conclusion that the uncle of the deceased was, in any
legal sense, acting as the agent or representative of the
plaintiff.

The remaining point to be dealt with is, whether the
mother would be precluded by the negligence chargeable
to the father, on the ground that the interests of husband and wife are identical, and a recovery by her would

also inure to the benefit of her husband, who would thus be allowed to profit by his own wrong. For the purposes of this discussion, the father may be treated as though he had himself taken his child upon the trestle, and was guilty of actual, rather than implied, negligence. Upon the question whether the negligence of the husband can properly be imputed to the wife, some conflict of opinion is presented by past decisions of the courts of this country. In Huntoon v. Trumbull, 2 McCrary, 315, this question was ruled in the affirmative; and upon the theory of "identity," it was therein held that: "The knowledge of the husband (who is the driver) concerning the disposition of the horse, is the knowledge of the wife." In the case of City of Joliet v. Seward, 86 Ill. 402, the negligence of the husband leaving his wife unattended in a buggy to which a spirited pair ·of horses were attached, was held to be imputable to the wife, although she herself was free from negligence. Similar rulings were made in: Yahn v. City of Ottumwa, 60 Iowa, 429; Peck v. Railroad Co., 50 Conn. 379; Carlisle v. Town of Sheldon, 38 Vt. 440; Railway Company v. Greenlee, 62 Tex. 344. It is fair to state, however, that in all the cases last cited, it appeared that the wife was being driven in a private vehicle by her husband, and doubtless the courts were influenced by the doctrine which still prevails in some jurisdictions, that the driver of a private carriage is to be regarded as the servant or agent of one who is riding with him and trusting to his skill and discretion. The opposite view was entertained in Platz v. City of Cohoes, 24 Hun, 101, wherein it was ruled that "the plaintiff was not responsible for any carelessness on the part of her husband in driving, unless she did some act encouraging it." In the more recent case of Hoag v. Railroad Co., 18 N. E. Rep. 648, decided by the Court of Appeals of New York, it was ruled that, under similar circumstances, the negligence

of the husband was not to be imputed to the wife; and Platz's case is cited with approval. For other cases upon the same line see Sheffield v. Central Union Telephone Co., 36 Fed. Rep. 164, and Shaw v. Craft, 37 Fed. Rep. 317, decided in the Circuit Court of the United States for the Northern District of Ohio. In Davis v. Guarnieri, 45 Ohio St. 470, 15 N. E. Rep. 350, the rule was laid down that the negligence of a husband would not be imputable to the wife unless she had expressly constituted him her agent for the purpose in hand. This, we think, is the test, which in every case should be applied. In support of the correctness of this view, we quote from the opinion of McBride, J., in Louisville &c. Ry. Co. v. Creek, 130 Ind. 139, 29 N. E. Rep. 481, who says: "A husband and wife may undoubtedly sustain such relations to each other in a given case that the negligence of one will be imputed to the other. The mere existence of the marital relation, however, will not have that effect. In our opinion, there would be no more reason or justice in a rule that would, in cases of this character, inflict upon a wife the consequences of her husband's negligence, solely and alone because of that relationship, than to hold her accountable at the bar of eternal justice for his sins because she was his wife." This admirable statement of the law we think should be decisive of the question with which we are now dealing. In the subsequent case of Chicago &c. Railroad Co. v. Spilker, 33 N. E. Rep. 280, the Supreme Court of Indiana again applied the wise and just rule above indicated; and Howard, J., cites numerous decisions bearing upon the subject.

In California the negligence of the husband is imputed to the wife, or rather, bars her recovery, for a reason peculiar to that State. By the California code, the damages recovered in such a case would become the joint property of the husband and wife, and the court

holds that it would be inequitable for him thus to share in the proceeds of his own wrong: McFadden *v.* Railroad Co., 87 Cal. 464, 25 Pac. Rep. 681. This rule would seem to be fully as unjust to the innocent wife as the other rule would be to the wrong-doer; and one would think that an innocent person was entitled to protection before a wrong-doer. Be this as it may, however, the reason given by the court in the case cited does not also obtain in this State. In Georgia, by express statute (Acts of 1887, p. 43), a mother is given an independent right of action for the homicide of a child negligently killed (upon certain conditions not pertinent to the subject now under discussion); and it is expressly provided that a recovery by her in accordance with the terms of the statute shall be her separate and individual property, not subject to any debt or liability of the husband.

Under the facts of the present case, the father was in no sense acting as the agent of, or in any manner representing, his wife. Only upon the idea of identity of interest could the act of one be regarded as that of the other. We have already shown that the rule which once obtained, whereby, upon the theory of "identity" or agency, the negligence of a father was imputed to his infant child, has been utterly repudiated in most jurisdictions, and no longer has any firm footing in the law of this country. The same reasons which have been urged against the injustice and harshness of that rule apply equally well to so indefensible a doctrine as that which would seek to charge a wife with the negligence of her husband, simply because of the marital relation existing between the two. Like the child, the wife has distinct, individual legal rights, which cannot be defeated simply by showing that another, to whom she was related by ties of wedlock, but over whom she exercised at the time no control, was guilty of negligence

concurrent with that of the defendant. Incidentally, the husband might derive some benefit from a recovery by her; indeed, upon her death, might inherit her estate, including the money so recovered. This, however, would likewise be true in a case where a child was allowed to recover, despite the negligence of its father; and yet, this is universally held not to be a sufficient reason for unjustly depriving the child of its legal rights as against a wrong-doer entitled to no protection whatsoever as to liability growing out of his own gross misconduct.

It would seem that the efforts on the part of the courts of an earlier day to formulate rules which would extend the doctrine of imputable negligence so as to include persons other than those who actually sustained towards each other the relation of master and servant, or principal and agent, or who were jointly engaged in the prosecution of a common enterprise, have proved to be entirely unsuccessful legal ventures. Such rules have already met the fate which must inevitably sooner or later have befallen them, for they stand upon no foundation of logic, wisdom or justice.

In *East Tenn., Va. & Ga. Ry. Co.* v. *Markens,* 88 *Ga.* 60, this court summarily disposed of the question whether the negligence of the driver of a public hack could be imputed to a female passenger, and quoted with approval the rule laid down in the American & English Encyclopædia of Law (vol. 16, p. 447) that: " In order for the negligence of one person to be properly imputable to another, the one to whom it is imputed must stand in such a relation of privity to the negligent person that the maxim *qui facit per alium facit per se* is directly applicable."

It follows inevitably, from what has been said, that the doctrine of imputable negligence cannot, under the facts of the present case, be successfully invoked so as to defeat the plaintiff's right to recover.

4. We come now to deal with the proposition announced in the fourth head-note   It is one of very great importance, and we have given it long and anxious consideration.   Our own cases are not in perfect harmony on this subject, but after a careful review of them, and an examination of a very large number of authorities, we believe we have reached the true law of the question.

This question was also involved, but not discussed, in the case of *Atlanta & Charlotte Air-Line Railway Company* v. *Leach*, 91 *Ga.* 419, 17 S. E. Rep. 619, which was an action by Mrs. Leach for the homicide of her husband, who was the uncle of the plaintiff's son, having him in charge when killed, and who, as already stated, was himself killed at the same time and place.   Mrs. Leach's right to recover was so plainly and manifestly defeated by the gross negligence of her deceased husband, irrespective of other considerations, that we were content to rest our decision of that case on that ground alone.

We will now notice briefly, and in their chronological order, the cases decided by this court which bear upon the question under consideration.   This list is intended to be exhaustive, and though we may omit some cases which might be considered as somewhat in point, we think we have all of them really material, and some of these are not vitally so.

In *Augusta & Savannah Railroad Company* v. *Mc-Elmurry*, 24 *Ga.* 75, the injury complained of, which was the killing of a slave and the destruction of a cart, was evidently committed upon a crossing, or so near to it as to be practically upon it.   The evidence is not set forth in the report; but the requests presented and refused, and the rulings of this court in connection with them, show that both court and counsel treated the case as one to which "the crossing law" was directly applicable.   This is true notwithstanding it was alleged in

the pleadings that the injury was done " at or near" a crossing, and although Judge LUMPKIN, in dealing with one of the requests, remarks that a particular speed is required " at or near " the crossing. Thus understood, there is nothing in this case militating against what is ruled in the case at bar; but on the contrary, many of the expressions used in the opinion are entirely in harmony with, and to some extent support it.

The first distinct announcement by this court touching the question whether the law regulating the speed of trains in approaching crossings was applicable in a case where the injury occurred elsewhere than at a public crossing, was in *Holmes* v. *Central Railroad and Banking Company*, 37 *Ga.* 593. The injury for which the action was brought was the killing of a slave on the track of the railroad, which took place at a point from sixty to eighty yards distant from a public crossing, but on a part of the track very much used by foot-passengers. There was a verdict against the company, and a new trial was granted by the superior court, whose judgment was affirmed by this court, upon the actual merits of the case. Counsel for the plaintiff in error endeavored to show that the company was liable for disregarding the provisions of the law in question, it being the act of January 22d, 1852 (Acts of 1851-2, p. 108), and which is now, except as to certain changes immaterial to the present inquiry, embodied in sections 708 to 710 of the code. Upon this contention, Judge WALKER plainly and unequivocally stated that: " This act was intended for the protection of persons and property at public crossings of the road. The public have a right to cross the railroad track at the public road crossings. When traveling the highway, persons are lawfully on the railroad track at the point of crossing; and if an injury is done at such public crossing, then the provisions of the act of 1852 become material. In this case, the

accident having occurred elsewhere, the provisions of this act are not applicable. The fact that so many persons traveled, on foot, over the portion of the road where the negro was killed, did not make the railroad a public crossing." This case has never, in terms, been overruled in the manner prescribed by statute; and the decision having been made by a full bench, the doctrine announced in it is therefore still of force. The clear and distinct statement of Judge WALKER is in no sense qualified because he adds that: " In deciding the question of what would be reasonable care and diligence, possibly this fact [meaning the fact that many persons traveled on foot over the portion of the road where the negro was killed] might be taken into consideration, in connection with all the other facts of the case." The liability of a railroad company for running over and killing or injuring people at places along its track which the public is known to frequent, and where it is probable they will be found, depends upon legal rules entirely distinct from the law prescribing what they shall do in approaching public crossings.

In the case of the *Western & Atlantic Railroad Company* v. *Main*, 64 *Ga.* 649, the railroad company was held liable for the killing of a cow between a signal-post and a public crossing; and it is inferable from the statements contained in the opinion of CRAWFORD, Justice, that the servants of the company in charge of the train had failed to obey the provisions of section 708 of the code, and this failure seems to have been regarded as a ground of liability. It is impossible to reconcile the charge of Judge McCUTCHEN, which this court approved, with the case of *Holmes, supra*. Again, in *Western & Atlantic Railroad Company* v. *Jones*, 65 *Ga.* 631, the injury for which the company was made liable was the killing of a horse at a point just beyond a public crossing. In so far as these two cases conflict with that of

*Holmes*, the doctrine of the latter, for the reason stated in the above comments thereon, must prevail.

The case of *Central Railroad* v. *Brinson*, 70 *Ga.* 207, which was an action for personal injuries inflicted by a moving train, not at a crossing, was decided by two justices, who did not themselves fully agree upon the question with which we are now dealing, in so far as it was then involved. After a careful examination of the opinions of Jackson, Chief Justice, and Hall, Justice, we find nothing in that case which would require a holding upon this question different from the one now made. The case of *Holmes, supra*, is cited by both, but there is no intimation that it should be overruled.

In *Western & Atlantic Railroad* v. *Bloomingdale*, 74 *Ga.* 604, which was an action for personal injuries sustained on the track at a point other than at a crossing, Branham, J., presiding in the place of Chief Justice Jackson, who was disqualified, distinctly stated that the portion of the charge of the court below in reference to ringing the bell when approaching public crossings was not applicable to the facts, and cited the *Holmes* case as authority for this proposition. The charge referred to, as appears from a foot-note made by the reporter, was in the following language : "In determining whether the agents of the company exercised such care and diligence, you will look to the evidence. If they were going at a greater rate of speed than was accorded by the ordinance of the city, if within the city limits, or if they were within four hundred yards of a public crossing, and were not ringing the bell of the engine as required by law, or if they failed to have signal lights or persons to look for danger, or if they failed to have headlights, if the exercise of ordinary and reasonable care and diligence required these things, all these would be circumstances, if they are shown to exist by the evidence, that ought to be considered by you in determining whether

the defendant's agents exercised all ordinary and reasonable care and diligence." This charge, so far as now pertinent, at most merely stated that evidence showing the violation of a city ordinance or the breach of a statutory duty in approaching a public crossing might be considered by the jury in passing upon the question of negligence actually involved in the case. Upon this particular subject, brief comment will be made in a subsequent division of this opinion.

Just here, however, it may be remarked that we do not understand the decision of the majority of this court in *Georgia Railroad* v. *Williams,* 74 *Ga.* 723, where the injury occurred two hundred yards beyond the crossing, as really going further than to hold that the failure of the company to observe the statutory requirements in approaching crossings, might be given in evidence and considered by the jury in determining the question whether the injury was caused by the company's negligence. If the decision in that case means that disobedience of these statutory requirements would, of itself, make the company liable, we would simply say it was a decision by two justices only; and we agree with Justice HALL, who dissented, in holding that such a view would be in conflict with the *Holmes* case, *supra,* and not with Chief Justice JACKSON, who seemed to think otherwise. Justice HALL also thought that the above cited cases from the 64th and 65th volumes of our reports did not necessarily conflict with the *Holmes* case. As to this, we think he was mistaken; but if those cases do conflict with the *Holmes* case, the latter must be followed as the true law binding on this court.

In *Western & Atlantic Railroad* v. *Meigs,* 74 *Ga.* 857, the writer, who was then on the circuit bench, presided in the place of JACKSON, Chief Justice. It was an action by Mrs. Meigs for the homicide of her husband, and it was simply held that: "Although the injury in this

case occurred a considerable distance from the Foundry
street crossing, the rate of speed with which the train
passed that crossing, and the ordinance above mentioned,
had some bearing on the question of negligence at the
place where the deceased was struck, and were, there-
fore, properly admitted to go to the jury for what
they were worth." This case also belongs to the class
already mentioned, where the fact of a failure to observe
a city ordinance or statutory requirements as to speed
was held to be admissible in evidence on the trial of ac-
tions of this kind.

The case of *Central Railroad and Banking Company*
v. *Smith*, 78 *Ga.* 694, was an action for personal injuries
sustained by the plaintiff, who was hurt by a moving
train, sixty-five or seventy yards from a crossing. Jus-
tice BLANDFORD did not preside. It was there held that
the violation of a valid municipal ordinance in running
trains would be negligence *per se*, and that the court
might so instruct the jury. The rule thus stated has, in
the recent case of *Central Railroad & Banking Co.* v.
*Golden,* noticed below, been limited in its application to
cases where negligence of this nature is negligence rela-
tively to the person injured. The ordinance in question,
in *Smith's* case, regulated the speed only upon crossings,
but the court gave it in charge as if it was applica-
ble to every portion of the town, which was inap-
propriate. The judgment was reversed, and a new trial
granted. The second trial of this case in the superior
court resulted in a nonsuit, which was affirmed by this
court. See *Smith* v. *Central Railroad and Banking Com-*
*pany*, 82 *Ga.* 801.

In *Central Railroad and Banking Co.* v. *Raiford*, 82
*Ga.* 400, though the plaintiff below was injured upon a
crossing, or very near to it, he was not at the time using
the highway for the purpose of crossing the railroad,
but was using the track for the purpose of walking

upon it; and it was held that though the statutory diligence as to giving signals in approaching public crossings was required of railroads primarily for the benefit of persons crossing the track, and not those walking upon it, yet, relatively to the latter, a failure to comply with the statute was evidence of negligence to be considered by the jury. This case does not squarely hold that such failure would alone make the company liable. It really does not, we think, go further than the class of cases referred to in connection with the *Meigs* case, *supra;* but even if it can be construed as holding that the failure in question would of itself be a ground of recovery, it does not conflict with what is ruled in the case at bar, for, in the *Raiford* case, the injury was practically upon a crossing, although the plaintiff was not making a proper use of it.

It appeared in *Port Royal & Western Carolina Railway Company* v. *Phinizy*, 83 *Ga.* 192, that the plaintiff's mule was killed upon a trestle between a blow-post and a public crossing, probably one hundred and fifty yards from the crossing; and it was held that, according to the principle ruled in *Jones'* case, *supra* (65 *Ga.* 631), there was no error in giving in charge to the jury sections 708 and 710 of the code. Chief Justice BLECKLEY said: "If they are pertinent when stock are beyond the crossing, we can see no reason why they are not so when the stock are on the hither side of the crossing. The sections, and the conduct of the company's employees under them, are simply for consideration by the jury. Their importance is nothing like the same when the injury occurs at a distance from the public crossing, as when it occurs upon the crossing. Still, they have some relevancy in either case." The Chief Justice doubtless overlooked the case of *Main, supra* (64 *Ga.* 649), which was precisely in point. We dispose of the *Phinizy* case as we did of the two cases just mentioned in this connection.

In *Central Railroad and Banking Co.* v. *Denson,* 84 *Ga.* 774, the plaintiff below recovered for the homicide of her husband, which occurred between a blow-post and a public crossing, and the judgment in her favor was affirmed by this court, SIMMONS, Justice, dissenting. Although the question of negligence in failing to observe the requirements of section 708 of the code was somewhat involved in the case, we think a close examination of it will show that the recovery was allowed to stand, not because of the mere failure of the employees in charge of the train to obey this particular statute, but upon the idea that the fact of the killing changed the burden of proof, and that, as the company introduced no evidence, the jury were authorized to infer these employees were guilty of gross and wanton negligence.

The case of *Ivey* v. *East Tenn., Va. & Ga. Railway Co.,* 88 *Ga.* 71, was decided by two justices, who affirmed the granting of a nonsuit, although the train was running too fast and the bell was not rung in approaching a crossing, it appearing that the injury did not take place at a crossing, but some distance beyond it; also, that it did not directly result from any negligence of the company, but really from that of the plaintiff himself.

The record in *Georgia Railroad & Banking Co.* v. *Daniel,* 89 *Ga.* 463, shows that the plaintiff was injured a few yards from a crossing, in the direction of an approaching train, and that he was at the time using the track as a footway. It was held that under the particular facts of that case, the engineer had no right, as a matter of law, to assume, on first seeing the man on the track, that he would get off in time to save himself; and also, that it would not have been appropriate, in a case of this kind, to instruct the jury, without proper explanation and qualification, that the statutory requirements as to blowing the whistle, ringing the bell, and checking

the speed, were not for the protection of persons using the track as a thoroughfare; and further, that instructions on the subject should conform to what was ruled in *Raiford's* case, *supra*.

The case of the *Central Railroad & Banking Co.* v. *Golden*, above mentioned, and which was decided January 8th, 1894* (93 *Ga.*    ,    S. E. Rep.    ), has some bearing on the question now under consideration. It was an action for personal injuries caused by a collision with a train, more than two hundred yards from a public crossing which the train was approaching. We then held it was not error, in charging the jury, to recite sections 708, 709 and 710 of the code. This harmonizes with the rule, already frequently mentioned, as to the admissibility of evidence showing a violation of these sections. It was, however, also held that while the failure to observe the requirements of these sections might, in the abstract, be negligence *per se*, it might be no negligence at all relatively to a person thus injured; and that in *Golden's* case, it really amounted to no more than a fact to which the jury could look in ascertaining whether, relatively to him, the company was negligent or not.

In connection with all the above cases, see also the following, which, while not bearing directly upon the question in hand, may throw some light upon it: *Morgan* v. *Central Railroad & Banking Co.*, 77 *Ga.* 788, in which Justice HALL remarks that the provision requiring continuous checking of speed is a harsh one, and suggests legislation modifying it. In that case it was held that the statute, being penal in its nature, should be strictly construed, and should not be held to apply to a train working exclusively within the blow-posts. *Harris* v. *Central Railroad & Banking Co.*, 78 *Ga.* 526, 535, where it was held the statute had no application when a train

*Opinion not yet filed.

started at or upon a public crossing. *Crawley* v. *Georgia Railroad & Banking Co.*, 82 *Ga.* 190, where stock was killed between the blow-post and a crossing, and it was held that the law does not require the speed of the train to be checked before reaching the blow-post; and if the train be under such control that it may be stopped at the crossing, no liability would attach because of its running too fast to be stopped at any intermediate point between the blow-post and the crossing.

There is one other Georgia case which has not been before mentioned, because "the crossing law" was not involved in it, but it is, in principle, applicable here. We refer to *Holland* v. *Sparks, receiver*, 92 *Ga.* 753, 18 S. E. Rep. 990, which sustains the doctrine that the breach of a given duty is not negligence relatively to one to whom the duty in question was not due.

We will now notice some of the leading text-books, and later on, some of the decisions of other courts in connection with the question in hand, and, with but little comment, make extracts from the same, many of which will illustrate the pertinency of the case last cited to the present discussion. Before proceeding further, however, it may be well to observe that the law requiring the checking of trains in approaching crossings seems to be peculiar to Georgia, and we therefore cite authorities relating to the giving of signals, and to other matters which, by strong analogy, are in point.

The following is from Bishop's Non-Contract Law, §446: "To sustain an action for negligence, the plaintiff must have suffered a legal injury whereof he is entitled to complain. Therefore, however great the defendant's negligence, if it was committed without violating any duty which he owed either directly to the plaintiff, or to the public in a matter whereof he had a right to avail himself, . . . there is nothing which the law will redress." And in section 1038, referring to trespassers

on the track, this eminent author applies the rule by saying: "Though the failure to give a signal required by the law, or a rule of the road, is negligence in its management, not always, perhaps never, in just doctrine, can a trespasser so avail himself of the omission as to charge the road. . . . In reason, rules requiring signals, prohibiting dangerous fast running and the like, should be construed as intended to protect persons to whom the road owes a duty, not trespassers; so that the former only can found rights upon them."

"If there is no duty, there can be no negligence. If the defendant owes a duty, but does not owe it to the plaintiff, the action will not lie." 1 Shear. & Redf. on Neg. §8. To the same effect, see Cooley on Torts, *659 *et seq.* This distinguished jurist illustrates the application of the rule as follows: "The general duty of a railway company to run its trains with care becomes a particular duty to no one until he is in a position to have a right to complain of the neglect: the tramp who steals a ride cannot insist that it is a duty to him; neither can he when he makes a highway of the railway track and is injured by the train. A man may be careless to the degree of criminality who leaves poisoned food about where others will be likely to pick it up and be injured by it; but he owes in this regard no duty to the burglar who breaks into his house to despoil it. So it may not be wise or prudent for one to have upon his premises an uncovered pit, but he is under no obligation to cover it for the protection of trespassers." See, also, Patterson's Ry. Accident Law, 160–162, where cases are collected with reference to the duty, relatively to different classes of persons, of giving signals.

We find the following in the American & English Encyclopædia of Law, vol. 16, title "Negligence," pp. 411, 412: "In order to maintain an action for a negligent injury, it must appear that there was a legal duty

due from the person inflicting the injury to the person
on whom it was inflicted, and that such duty was vio-
lated by a want of ordinary care on the part of the de-
fendant.   It is not sufficient that there be a general duty
to the public which is violated, but in all civil cases, the
right to enforce such duty must reside in the individual
injured because of a duty due him from his injurer, or
'he cannot recover." In an article entitled " Crossings,"
appearing in this same most valuable and useful work
(vol. 4, pp. 922, 923), the penal nature of many of the
statutes requiring the giving of signals on the approach
of trains to public highways is commented upon, and
allusion is made to the familiar rules by which viola-
tions of penal laws are generally treated as willful, and
the wrong-doer often held responsible for even remote
consequences of his acts of omission or commission.
But the author adds that : " It is not usual, however, to
apply these *quasi* criminal law doctrines to cases involv-
ing the omission of statutory signals by railroad com-
panies, and they are generally determined by the rules
that govern in cases of negligence."   In a note to which
reference is directed, it is further said : " This sufficiently
appears from the numerous cases cited throughout this
article wherein omissions to comply with statutory re-
quirements are treated as merely negligent.   It is proper
to so treat them, because the statutory requirements are
generally only intended to raise the standard of care,
and make precautions necessary that would not have
been required at common law."

Disobedience of a criminal statute forbidding a thing
*malum in se,* is a much more serious matter than the vio-
lation of a statute which simply makes a given act
*malum prohibitum ;* that is, forbids something innocent
in itself, and renders it unlawful on the ground of public
policy and in the common interest of good government
and the public welfare, for the purpose of compelling a

v 93-26

higher standard of care with regard to certain persons
or things, and, to this end, places under proper re-
strictions a business dangerous in itself, and likely to
prove hazardous to life or limb if not conducted with
abundant caution.    Accordingly, while every one is re-
sponsible for the *direct* consequences of any criminal act,
and oftentimes for the *remote* consequences of a criminal
act which is *malum in se*, it does not follow that every
one is responsible for all the consequences, direct or re-
mote, of an unlawful act which is merely *malum pro-
hibitum*.

In Gorris *v.* Scott, L. R., 9 Ex. 125, it was said:
"Where a statute creates a duty with the object of pre-
venting a mischief of a particular kind, a person who,
by reason of another's neglect of the statutory duty,
suffers a loss of a different kind, is not entitled to main-
tain an action in respect of such loss."    Accordingly,
notwithstanding the statute in question imposed penal-
ties to secure the observance of its provisions, it was
held, that as its object was to prevent the spreading of
contagious diseases among animals while being trans-
ported by vessel, and not to protect them against perils
of the sea, the plaintiff could not base upon this statute
a right to recover because of a failure to furnish, as it
required, separate pens for his sheep, by reason of which
omission to comply with the statutory duty, a number
of them were washed overboard and drowned.

An interesting case in this connection is that of At-
kinson *v.* Newcastle &c. Waterworks Co., L. R., 2 Ex.
Div. 441, in which it was held that the mere fact that
the breach of a public statutory duty, for which a pen-
alty recoverable by a common informer was imposed,
has caused damage, does not vest a right of action in
the person suffering the damage against the person guilty
of the breach; and that whether or not such right of
action arose from the breach must depend upon the ob-

ject and language of the particular statute. An examination of the facts, and of the opinions of Lord Cairns, L. C., Cockburn, C. J., and Brett, L. J., will show that this case is very much in point. It reversed the judgment of the Court of Exchequer in the same case, L. R., 6 Ex. 404, which followed Couch v. Steel, 3 E. & B. 402; L. J., 23 Q. B. 121.

It appeared in St. Louis & San Francisco Ry. Co. v. Payne, 29 Kan. 166, that the plaintiff drove to a mill situated about one hundred yards from a public railway crossing, tied his team to a hitching-post, and went into the mill. Shortly thereafter, his team became frightened by the noise of an approaching train, broke loose, ran in the direction of the crossing, and there collided with the train. The company failed to comply with the statutory requirement as to sounding the whistle upon approaching the crossing, for which neglect of duty the statute provided a penalty. Plaintiff sought to recover damages on the ground that, had the company complied with the statute, he would have had an opportunity to look after his team, and thus have avoided the accident. It was held that: "As plaintiff was not traveling on the highway, at or near the railroad crossing, the company owed him no duty, under the statute, to sound the whistle for the purpose of giving him notice, so that he might leave the mill and hold or look after his team to keep it from breaking loose and running away."

The following is the head-note in Williams v. Chicago & A. R. Co., 26 N. E. Rep. 661, s. c. 135 Ill. 491: "Negligently omitting to whistle or ring a bell when approaching a crossing, as required by [statute] does not render the company liable to a farmer who is plowing in his field near the crossing, and who is injured through his horses taking fright at the train, since the statutory requirement is only intended for the benefit of travelers on the highway." The opinion in that case,

delivered by Magruder, J., is strong and pointed. He cites many authorities, including our *Holmes* case, *supra.*

In Morrissey *v.* Providence & Worcester R. R. Co., 15 R. I. 271, it appeared that the company had failed in the duty imposed upon it by law, of guarding its track by the erection of fences along its right of way. The plaintiff, a child four years of age, strayed across the track in front of his home to the opposite side, and there being no fence to obstruct his passage, went thence upon land adjoining the company's right of way, and was there injured by falling into a trench filled with water. The court sustained a demurrer to the declaration, on the ground that the obligation of a railroad company to guard its tracks by fences is chiefly for the purpose of protecting persons and cattle from the danger to which they would be exposed by going upon the company's premises, and that this obligation did not extend to guarding a person against danger to which he might be exposed on the premises of its neighbors. In delivering the opinion of the court, Stiness, J., quotes the rule previously laid down in O'Donnell *v.* Providence & Worcester R. R. Co., 6 R. I. 211, and in Smith *v.* Tripp, 13 R. I. 152, that: "In an action for neglect of duty, it is not enough for the plaintiff to show that the defendant neglected a duty, and that he would not have been injured if the duty had been performed; but he must also show that the duty was imposed for his benefit, or was one which the defendant owed to him for his security from the injury." O'Donnell's case is very often cited in this connection. In harmony with the rule just quoted, it also holds that the statutory requirement as to ringing the bell of the locomotive before crossing any public highway "was exclusively designed for the benefit of persons crossing" such highway; "and hence, a person who is injured by the engine whilst he is walking along the track of the railroad, and not at any

crossing, cannot recover damages against the railroad company for such injury, upon the ground that the injury was caused by their neglect to ring the bell upon their locomotive, as required by the statute."

Metallic Compression Casting Co. v. Fitchburg R. R. Co., 109 Mass. 277, 280, was an action against the railroad company for damages alleged to have been caused by negligence in running a train over a line of hose stretched across the track and being used in extinguishing a fire. A few hundred feet above this point, the defendant's track was crossed by another railway. It was held that the defendant's failure to comply with the statutory requirement of stopping before crossing another railroad at grade had no bearing upon the question of negligence. Chapman, C. J., says : " But the object of the statute was solely to prevent the collision of trains at crossings, and had no reference to the extinguishment of fires. It is not applicable to this case."

A penal statute of New Hampshire prohibited railroad companies from obstructing, with their cars or locomotives, any public highway for a period exceeding two minutes. In Hall v. Brown, 54 N. H. 495, it was held that the purpose of this statute was to protect travelers against unreasonable delay at railway crossings, and a violation of it could not be relied on by the plaintiff as a ground of recovery in an action alleging that, being delayed at a crossing for more than two minutes by a train unlawfully obstructing the same, his horse, when an engine was attached and the train started, became frightened, ran away and was killed.

The plaintiff in Pike v. Chicago & A. R. Co., 39 Fed. Rep. 754, was a watchman on one of defendant's bridges, and was injured while attempting to cross a bridge located within about half a mile of a public railroad crossing. In passing upon a demurrer to his declaration, the Circuit Court of the United States, citing pre-

vious decisions of the Supreme Court of Missouri construing the statute requiring the giving of signals in approaching railway crossings, held that the statute could not be invoked in the plaintiff's behalf as a ground of negligence, but that he must rely solely for a recovery upon the question whether the defendant owed him a common law duty of giving notice of the approach of the train, plaintiff's duty requiring him to pass over the bridge, from time to time, to enable him to inspect it. In the opinion, Thayer, J., says, "the plaintiff, who was not hurt at the crossing, but was injured at a bridge a half mile east of the crossing, cannot assign the violation of the statutory duty,—consisting of not sounding the whistle or ringing the bell at the crossing,—as the proximate cause of the injury which he sustained. The statute was not enacted for his benefit."

It was held in Elwood *v.* New York Central & Hudson River Railroad Co., 4 Hun, 808, a case in which it appeared that plaintiff's intestate was walking along the track near defendant's depot, when he was struck by a work-train approaching in his rear and killed, that "the fact that the working train did not give the signal required by statute on crossing a street before reaching the depot, was not an act of negligence towards the intestate, who was not on the street, or where he had any business to be."

In Chicago, Rock Island & Pacific Railway Co. *v.* Eininger, 114 Ill. 79, it was held that: " A requirement of a railway company to keep a flagman at a public street crossing in a large city, to give warning of the approach of trains, is intended for the protection of persons crossing the railroad tracks at such crossing, and not for the benefit of persons walking along the railroad track, employing it as a foot-path. To the latter the company does not owe the duty in respect to a flagman."

The law is thus stated in Harty v. Central Railroad Co. of New Jersey, 42 N. Y. 468 : "A statute of New Jersey, requiring railroad companies to ring the bell or blow the whistle on approaching highway crossings at grade, and to maintain sign-boards of warning thereat, imposes no duty toward a person walking on the track, but not at the crossing." This case and that of O'Donnell, *supra*, are both cited in Randall v. B. & O. R. R. Co., 109 U. S. 478, 485, which is, itself, in point.

The following was announced in Bell v. Hannibal and St. Joseph R. R. Co., 72 Mo. 50, 4 Am. & Eng. R. R. Cases, 580: "The requirement of section 806 Revised Statutes, that the bell shall be rung or the whistle sounded at the approach of a railroad train to the crossing of a public highway, is for the benefit of persons on the highway, at or approaching the crossing. Failure to comply with the statute will furnish no ground of complaint to a person injured on the track at a distance from the highway."

We might multiply, almost indefinitely, the citation of cases, but surely enough has been presented to establish the doctrine of the fourth head-note. We do not, of course, mean to say there are not cases to the contrary, among which may be mentioned that of Lonergren v. Illinois Central Ry. Co., 49 N. W. Rep. 852, in which a rehearing was granted. See 53 N. W. Rep. 236, where the case is reported as "Lonergan" against the same company. It appeared that the plaintiff was lawfully on defendant's depot grounds unloading grain into a crib which was near two highway crossings, when defendant's engine passed without giving a signal and frightened plaintiff's team, causing the animals to run away and injure the plaintiff. It was held that under a statute providing that no railroad engine should approach a highway crossing without giving a signal, and making the neglect to give such signal a misdemeanor,

the defendant was liable, though the plaintiff was not attempting to use either crossing. Rothrock, J., cites *Georgia Railroad* v. *Williams*, 74 *Ga.* 723, and *Central Railroad & Banking Company* v. *Raiford*, 82 *Ga.* 400, *supra*, in support of the conclusion reached by the Supreme Court of Iowa. The comment we have already made upon these two cases is sufficient, we think, to show that they do not really sustain the doctrine of the Iowa case; but even if they were appropriately cited in that case, they do not, as has been shown, constrain us to now follow that doctrine.

5. We have not, of course, intended to even intimate, by anything already said, that the duty is not upon railroad companies to observe all ordinary and reasonable care and diligence to avoid injuring or killing a human being on the track elsewhere than at a public crossing, when his presence becomes known to the engineer. It is undoubtedly true that a failure in such care and diligence, after that time, from which injury results, will render the company liable unless it could have been avoided by the use of ordinary care on the part of the person hurt or killed. There is, however, to some extent, a distinction between what would be the duty of persons in charge of a railroad train with reference to cattle or other domestic animals, and with reference to human beings upon the track. The company's servants ought to endeavor to stop the train as soon as animals are seen on the track, because there is no presumption that they will leave it so as to escape the danger; but, as has been often ruled, the persons in charge of the locomotive need not always begin to immediately check the speed of the train, or endeavor to stop it, when a human being, apparently without infirmity, is seen upon the track, for the presumption is that he will leave it for his own protection. In a case like the present, however, it was the imperative duty of

the engineer to endeavor to stop his train immediately upon seeing the man and the boy. They were upon a high trestle, and it was obviously out of their power to escape danger except by going forward to the end of the trestle. They could not leave their place of danger by going off to one side. It was, therefore, no place for a presumption that they would be able to take care of themselves. The evidence shows beyond all controversy that every possible effort *was* made to stop the train and save the lives of this man and boy as soon as they were observed by the company's servants. It is, therefore, under the law as herein ruled, not liable in damages for the homicide of the child.

The duty of stopping a train to prevent injury to cattle or horses, or to prevent destroying human life, exists, when the danger becomes apparent, irrespective of " the crossing law." This duty applies generally to all portions of a railway track, and the provisions of our statute regulating the duties of engineers in approaching public crossings are specifically applicable in cases where injuries have occurred upon such crossings.

6. If we have succeeded in showing that the proposition announced in the fourth head-note is sound law, it follows that where one is injured or killed upon the track of a railroad, elsewhere than at a public crossing, and there is no negligence imputable to the company except the failure of its servants to obey the statutory requirements above mentioned, the company is not liable. In the present case, there was no evidence authorizing a finding that the company's servants were guilty of any negligence whatever, if the failure in the above respect be counted out; and we therefore think the verdict was wrong. In cases of this nature, however, the failure of the company's servants to obey the statute prescribing their duties in approaching public crossings is, when a part of the *res gestæ*, admissible in evidence,

and may be considered by the jury in passing upon the question whether there was or was not negligence on the part of the company relatively to the person injured or killed; that is, negligence arising from a breach of duty, due at the time and place of the calamity, by the company to that person. This court, as will appear from its numerous decisions already cited, and from many others which could readily be found, is thoroughly committed to the propositions just stated, and has no disposition to recede from them. It is safe to say that whatever forms a part of the *res gestæ* of any transaction or occurrence undergoing judicial investigation may be proved. The principal difficulty, in a case against a railroad company for an injury on the track not at a crossing, consists in defining what use can properly be made by the jury of the fact that the servants of the company disregarded the requirements of the statute in approaching some crossing near the scene of the injury. Generally, any fact constituting a part of the *res gestæ* has some bearing upon a proper determination of the real matter in controversy between the parties. Sometimes, a fact concerning the admissibility of which there can be no question is of very little consequence; and at other times, the same fact may be vitally important. For instance, on the trial of an indictment for an assault and battery, it would usually be entirely immaterial whether the accused at the time of the fight wore a black coat or a brown one; but it is easy to conceive of circumstances under which this apparently trivial matter might become a vitally serious issue. It would be difficult to express in words a precise and accurate rule, applicable alike in all cases, for measuring the importance or lack of importance which should be attached to any given fact in determining a question of negligence. An honest jury is more than apt to give each fact and circumstance its proper value without the aid

of minute and detailed instructions from the court; and
consequently, it would generally be sufficient, on the
trial of an action against a railroad company for an in-
jury occurring upon its track in the vicinity of a pub-
lic crossing, for the judge to inform the jury that the
mere failure of the company's servants to observe the
provisions of section 708 of the code in approaching
the crossing would not, of itself, be a ground of recovery
against the company, but that they might take this fail-
ure into consideration in determining whether there was
on the part of the company, in the given case, any act
of negligence which would make it liable. And it would
also be very appropriate for the judge, in this connec-
tion, to explain clearly to the jury the question of neg-
ligence really involved. In most cases of this kind,
the plaintiff relies upon the statutory presumption of
negligence against the company, and also strengthens
his case by whatever available evidence he may have at
his command.  On the other hand, it usually happens
that the company undertakes to vindicate its diligence
by calling as witnesses its servants who were present
when the injury was inflicted.  In this manner, the
issues submitted to the jury are formed.  Where an em-
ployee of the company is put on the stand as a witness
for the defendant, his entire conduct at the time of the
transaction under investigation, whether such conduct
be disclosed by his own testimony or by that of others,
may be considered by the jury in determining what
weight should be given to his testimony.  Suppose, for
instance, it was charged that an engineer, after seeing
a person or an animal on the track, failed to take the
proper precautions to prevent a collision and rushed
forward regardless of consequences, and that this charge
was stoutly denied by him.  Then, certainly, all he did
at the time would be material in weighing what he said
as a witness.  If it appeared that he deliberately dis-

obeyed a public law of the State, this fact might, in the opinion of the jury, throw some light upon the question as to whether or not he had disregarded any other duty devolving upon him. We do not say it ought to do so, but it is a matter for them. If, on account of the exigencies of commerce and travel, the law as to crossings is generally and notoriously disobeyed by all railroad companies, the fact that no attention was paid to it in a given instance would be of less importance, as a basis of reasoning, than would be the case with respect to some other ·law which is .almost universally obeyed. Again, to run a train without checking over a public crossing but little used, would tend in a far less degree to show that the engineer was a reckless man than would the running of a train at a high rate of speed over a crossing in a populous district or in a city where crowds of people were constantly in the habit of using the crossing. If a railroad company had a rule requiring its engineers to run over ·bridges at a low rate of speed, and it appeared that an engineer had violated this rule by running over a given bridge at a dangerous rate, this fact might have some bearing upon the question whether or not he was reckless or negligent in the infliction of an injury immediately thereafter upon a person or property upon the track. This would be so, although the act of negligence mentioned was merely the breach of a duty which such engineer owed to his employer, and not a violation of a duty which the company owed to the person injured, or a matter as to which the latter had any right to complain.

The instances above given are not exhaustive, and are intended to be merely suggestive. We leave the law as announced, to operate as the general rule, and will trust to the trial courts and juries to make the proper application of it in each particular case.

7. Willingham, the witness mentioned in the first di-

vision of this opinion, testified to his knowledge of the place where the homicide occurred, and gave it as his opinion that, at such a place, a train running at the rate of forty-five miles an hour could be stopped within a distance of one hundred yards. The evidence of all the witnesses shows beyond question that the train which killed the plaintiff's son consisted of a locomotive and six cars, and at the time of the catastrophe, was running down grade at about that rate. Willingham, as has been seen, was not introduced as a witness on the trial, but his testimony, as taken down on a former trial, was read to the jury. If his evidence does not relate to a train of this kind, running down grade at the rate specified, it is inapplicable; if it does, it amounts to no more than the expression of an opinion on his part that such a train could, under these circumstances, be stopped within a distance of one hundred yards. We do not think his mere opinion sufficient to overthrow the positive, and otherwise uncontradicted, evidence of the engineer and fireman, who were upon the identical train in question, that all was done which could possibly be done to stop the train, and that nevertheless it was not stopped within a distance of over four hundred yards. Besides, the testimony of these two witnesses is entirely consistent with common knowledge and every-day experience, and was strongly corroborated by other witnesses who were experts in such matters, and who testified positively that, under the circumstances, such a train could not have been stopped in time to avoid the catastrophe. It also appeared that the engineer and fireman manifested the greatest concern for the safety of the man and boy on the trestle, and there is nothing in the entire record to indicate the slightest disposition to wantonly kill these unfortunate persons. Under these circumstances, no jury would be authorized to accept as correct the unsupported, and apparently unreasonable, opinion

of a single witness as to the distance within which the train could have been stopped, and utterly ignore the overwhelming testimony to the contrary.

*Judgment reversed.*